MARTIN J. KRAVITZ, ESQ.
Nevada Bar No. 83
ADAM J. WAX, ESQ.
Nevada Bar No. 12126
**KRAVITZ, SCHNITZER & JOHNSON, CHTD.**
8985 S. Eastern Avenue, Suite 200
Las Vegas, Nevada 89123
Tele: (702) 362-6666
Fax: (702) 362-2203
Email: mkravitz@ksjattorneys.com
Email: awax@ksjattorneys.com

PATRICIA L. GLASER, ESQ.
CA State Bar No. 55668 *(Pro Hac Vice to be filed)*
SEAN RILEY, ESQ.
CA State Bar No. 123533 *(Pro Hac Vice to be filed)*
MICHAEL E. GERST, ESQ.
CA State Bar No. 266514 *(Pro Hac Vice to be filed)*
**GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO LLP**
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920
Email: pglaser@glaserweil.com
Email: sriley@glaserweil.com
Email: mgerst@glaserweil.com
*Attorneys for Plaintiff International Payment Advisors LTD*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| INTERNATIONAL PAYMENT ADVISORS LTD, a Nevada limited liability company<br><br>Plaintiff,<br>v.<br><br>PAYSAFE SERVICES (US) LLC, a Delaware Corporation; and DOES 1-10 inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT** |

///

///

1

# COMPLAINT

Plaintiff International Payment Advisors LTD, a Nevada limited liability company ("IPA" or "Plaintiff"), files this Complaint against Paysafe Services (US) LLC ("Paysafe") and Does 1 through 10, inclusive (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1. Marc Maxwell ("Maxwell") ran a successful business known as GMA in the merchant credit card processing industry commencing in 2010. In July 2014, GMA was acquired by an affiliate of Paysafe known as Optimal Payments. Paysafe is a global company operating in the same industry as GMA.

2. Following the acquisition of GMA, Maxwell initially provided services in managing GMA pursuant to an employment agreement. Subsequently, Paysafe and Maxwell, on behalf of IPA, negotiated and executed an Independent Contractor Agreement on July 19, 2017 and effective as of January 1, 2016 (the "Agreement"), providing for IPA to act as an independent contractor with exclusive control over the operations of GMA. Maxwell is the founder and President of IPA. A true and correct copy of the Agreement is attached as Exhibit 1.

3. In pertinent part, the Agreement invested IPA with complete control over GMA's operations, including management of the administrative, underwriting, and sales functions of the GMA business unit as well as the compensation, hiring, promotion, demotion, and termination of GMA staff. Even more significantly, the Agreement afforded IPA the right to terminate the Agreement with "Good Reason" where, among other matters, Paysafe took any action interfering "with [IPA]'s management and operations of the GMA business unit in the ordinary course of business consistent with past practice," Paysafe reduced any element of IPA's compensation and/or Paysafe took "any action with respect to the operation of the GMA business unit that could reasonably be expected to have the effect of decreasing the gross revenue or increasing the expenses of the GMA business unit." (Agreement ¶ 1(b))

4. Paysafe took exactly these actions against IPA in June 2018, resulting in IPA's June 22 notice to terminate the Agreement for "Good Reason". Absent Paysafe's cure of these

breaches within 30 days (*i.e.,* by July 22, 2018), the Agreement explicitly provided, in addition to payment of any amounts owed to IPA through the effective date of termination, for the payment of a liquidated damages amount calculated as follows:

> "The Company [Paysafe] shall pay to the Independent Contractor [IPA], in a lump sum, within ten (10) days of the effective date of termination, an amount equal to two (2) times the sum of the amount of the annual retainer, the amount of each of the last four (4) quarterly bonus payments, and the amount of the last annual bonus".
> (Agreement ¶ 3(c))

5. This liquidated damages calculation together with the amount owing to IPA through the termination date amounted to at least $16,852,735.92 as of the payment due date of July 9, 2018.

6. There can be no dispute that Paysafe's actions in June 2018 explicitly fell within the contractual definition of "Good Reason" for termination, giving rise to this liquidated damages payment. Paysafe stated it would no longer pay IPA the Consulting Fee[1], replacing it with reduced compensation pursuant to a new employment agreement for Maxwell. In addition, Paysafe also unilaterally acted to eliminate GMA as a separate and distinct business unit, combining its operations and staff with Paysafe's at new physical locations and entirely new reporting responsibilities, all over IPA's objections.

7. Paysafe's actions not only interfered with IPA's management and operation of the GMA business unit, its actions completely eliminated the GMA business unit, merged it with Paysafe, and completely eliminated IPA's control over those operations.

8. By this Complaint, IPA seeks full recovery for these actions in breach of the Agreement.

/ / /

---

[1] The Consulting Fee consisted of a $200,000 annual retainer, quarterly bonuses as a percentage of EBITDA based on performance, and an annual 20% bonus of GMA's EBIDTA subject to certain conditions. (Agreement Ex. A.)

## THE PARTIES

9. Plaintiff IPA is, and at all relevant times was, a Nevada corporation, with its principal place of business in Las Vegas, Nevada.

10. Upon information and belief, Defendant Paysafe is, and at all relevant times was, a Delaware corporation, with its principal place of business in Wilmington, Delaware.

11. Defendant DOES 1 through 10 are persons and entities that participated in the course of conduct described in this Complaint, whose identities are currently unknown by Plaintiff. DOES 1 through 10 include direct or indirect subsidiaries or affiliates of the named Defendant entity and other persons involved in the conduct described in this Complaint. Plaintiff will amend the Complaint to show the true names of the DOE Defendants when Plaintiff learns those names.

## JURISDICTION

12. Jurisdiction in this Court is proper pursuant to diversity jurisdiction under 28 USC § 1332, as the Plaintiff is a citizen of Nevada and the Defendant is a citizen of Delaware. There is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000.

13. Venue is proper in this Court because Plaintiff is a Nevada resident and the Agreement in question was entered into by Plaintiff in Nevada.

## GENERAL ALLEGATIONS

**I.  GMA Develops A Successful Business In The Merchant Credit Card Processing Industry**

**A.  GMA's Role In Merchant Credit Card Processing**

14. GMA has been a successful business in the merchant credit card processing industry since 2010. GMA operates as an Independent Sales Organization ("ISO") providing sales, risk and underwriting services to merchant payment processors, and in doing so supports efficient processing of credit card transactions for merchants selling products and services online. As compensation for its services, GMA receives a percentage of fees charged to merchants for the processing of their credit card transactions.

15. Throughout its history, GMA has developed a specialty in merchants operating in the continuity space. The continuity space refers to online merchants who typically sell their products and services based upon an initial trial offer followed by monthly billing against a credit card number without a credit card being present (known as "card not present" transactions in the industry). A common example of this type of billing transaction online is the one used by Netflix to charge subscribers after an initial trial period. In this space, the risk of fraud is higher than in traditional card present transactions, and accordingly, the level of underwriting and ongoing monitoring performed by GMA is greater.

16. The most significant downside of operating in this continuity merchant space is a greater potential for consumers to request that their credit card companies cancel transactions based upon an assertion of fraud, dissatisfaction with the goods or services, or other reasons.

17. If the merchant is unable or unwilling to pay the chargeback then the acquiring bank, which is the bank that supports the merchant, is obligated to honor the chargeback. Doing so requires the acquiring bank to pay the bank actually issuing the consumers' credit card (known as the issuing bank), which can result in significant losses to the acquiring bank.

18. In order to minimize this risk, the acquiring banks or their payment processors use companies such as GMA to perform due diligence before agreeing to take on new merchants to the portfolio, and then monitor the processing activity of those merchants to detect fraud and terminate merchants as necessary. GMA was diligent in monitoring the conduct of its merchant portfolio because it was financially liable.

19. Moreover, the credit card companies act as self-regulatory organizations, imposing rules and regulations to curb merchants generating excessive chargebacks. Specifically, the credit card companies (such as MasterCard) impose monthly thresholds for chargebacks and require that merchants exceeding the chargeback thresholds be terminated.

20. In addition to these strict thresholds, the acquiring and issuing banks also put in place restrictions designed to eliminate fraud in continuity transactions leading to chargebacks. In the instant case, GMA primarily provided its sales, risk, and underwriting services to payment

5

processor Priority Payment Systems ("Priority"), which had the direct relationship with the acquiring bank.

21. In this context, GMA continuously provided these services to Priority, and in turn to the acquiring banks retaining Priority. GMA's sales operation is responsible for maintaining and expanding the portfolio of merchants boarded with Priority and its acquiring bank. In tandem with sales, GMA employs a rigorous risk and underwriting operation to approve new merchants and to monitor the activity of merchant transactions to ensure risk compliance, including compliance with the chargeback thresholds.

### B. The Players Involved In The Processing System

22. In the period from 2010 through the end of 2016, the acquiring bank serving the GMA merchant portfolio was Harris Bank; in the period from early 2017 through March 2018, the acquiring bank was Merrick Bank. The payment processor entity which contracted with GMA to provide the above-referenced services for these acquiring banks was Priority from 2010 through March 2018.

23. GMA's relationship with Priority regarding new continuity merchant accounts ended in or about March 2018, when Priority advised IPA that it would only be using other existing ISO's that had contracted at a lower cost than GMA.

24. Despite this change for new accounts, the GMA/Priority relationship continued for existing merchant accounts. In this relationship, it was Priority (and not GMA) that interacted with the acquiring banks, and as necessary, the credit card companies (e.g., Visa, MasterCard) to report on new merchant accounts, risk underwriting on an ongoing basis and any issues concerning payment processing or fraud detection.

25. GMA, IPA, and Maxwell had no direct line of communication with Priority's acquiring bank.

### C. GMA's Success In The Payment Processing Space

26. In every year over the period from 2010 through 2014, GMA developed a significant portfolio of merchants, and continually increased the numbers of merchants and its

EBITDA. Specifically, GMA increased is merchant portfolio from no merchants at the time of its 2010 inception to 561 merchants by the beginning of 2014. Consistent with this increase in the merchant portfolio, GMA also increased its EBITDA from no profits earned in 2010 to over $7.8 million in 2014.

27. Based upon its rigorous risk and underwriting operation, GMA was also successful in retaining its merchant portfolio throughout this period, on par with the best in the industry.

## II. Paysafe Acquires GMA In 2014 And The Business Continues To Improve Through Mid-2017

28. In July 2014, GMA was acquired by an affiliate of Paysafe known as Optimal Payments. As part of this transaction, Maxwell executed an employment agreement with another Paysafe affiliate, NetBx Services, LLC. Maxwell, supported by the GMA staff of approximately 12, continued to drive the merchant payment processing business and achieved stellar results. By early 2016, GMA's EBITDA was over $900,000 per month, with year-end EBITDA of over $14 million.

29. In May 2016, Paysafe, through its Chief Operating Officer, Danny Chazanoff ("Chazanoff"), initiated discussions with Maxwell to develop a new agreement for the operations of GMA. During 2016, Chazanoff and Maxwell on behalf of IPA agreed to terms whereby (1) IPA became an independent contractor with exclusive management and control over GMA's operations, and (2) IPA's compensation was based upon, among other matters, increasing percentage payment rates pegged to increasing annual EBITDA thresholds. It was further agreed that these revised arrangements would be retroactively in effect as of January 2016. IPA continued to manage GMA under this oral agreement and was paid consistent with this agreement.

30. Through the summer of 2017, GMA consistently beat revenue and EBITDA forecasts for each fiscal period. As of the summer of 2017, it had achieved over $10.5 million EBITDA from its merchant portfolio. Moreover, its merchant portfolio grew from 790

7

merchants at the time of Paysafe's 2014 acquisition to over 1,600 merchants in the summer of 2017.

### III. Paysafe Executes An Independent Contractor Agreement With IPA On July 19, 2017 With An Effective Date Of January 1, 2016

31.     While IPA through its President Maxwell acted in good faith in continuing to work pursuant to the oral agreement with Paysafe, IPA insisted that the agreement be reduced to writing. An Independent Contractor Agreement was negotiated between Paysafe and IPA and executed on July 19, 2017, retroactive to January 1, 2016. Pursuant to the Agreement, among other matters:

- IPA's complete control over the operation of GMA was confirmed. (Agreement ¶ 1(a));

- IPA's complete control over GMA's operations included management of the administrative, underwriting and sales functions of the GMA business unit. (*Id*. at ¶ 1(a));

- IPA had the right to make decisions with respect to (1) the hiring, promotion, demotion, and termination of staff for the GMA business unit, (2) the compensation payable to such staff, (3) managing relationships with vendors to the unit and (4) "mutually" agreeing with Paysafe on the budget for all aspects of the GMA business unit operations. (*Id*. at ¶ 1(a));

- Paysafe agreed it would not "take any action that would interfere with IPA's management and operation of the GMA business unit in the ordinary course of business consistent with past practice" and further agreed that "it will not take any action with respect to the operation of the GMA business unit that could reasonably be expected to have the effect of decreasing the gross revenue or increasing the expenses of the GMA business unit". (*Id*. at ¶ 1(b));

- IPA had the right to terminate the Agreement with "Good Reason" upon 5 days' notice based upon (A) a material breach of any provision of this

8

Agreement by the Company; (B) a material adverse change in independent contractor duties and authorities as provided for in this agreement; (C) a reduction in any element of the Consulting Fee; or (D) a relocation of independent contractor's principle place of business of more than fifty (50) miles from the location as of the effective date.  This termination right was subject to the proviso that, "to the extent curable, the Company [Paysafe] must be provided with a thirty (30) day period following the Company's receipt of such notice [of termination] to cure the event(s) that trigger Good Reason." (*Id*. at ¶ 3(e)); and,

- In the event of termination with Good Reason by IPA, then, "in addition to the payment of any amounts earned by the Independent Contractor through the effective date of termination," the parties also agreed to a payment of a liquidated damages amount calculated as follows:

    "The Company shall pay to the Independent Contractor in a lump sum within ten (10) days of the effective date of termination an amount equal to two (2) times the sum of the amount of the annual retainer, the amount of each of the last four (4) quarterly bonus payments and the amount of the last annual bonus"  (*Id* at ¶ 3(c)).

## IV. IPA Effectively Manages GMA Through And Materially Assists Paysafe In Response To A MasterCard Audit

### A. The MasterCard Audit Of Banks Boarding Continuity Merchants

32.  Beginning in October 2017, and on information and belief, continuing through the end of 2018, MasterCard conducted an industry-wide audit prompted by its concern that continuity merchants were improperly avoiding the chargeback cancellation thresholds by splitting their trade between affiliated merchant accounts, thereby creating lower chargeback percentages over a broader range of accounts.  This conduct is known as "load balancing."

9

33. On information and belief, MasterCard's audit was primarily concerned with eliminating merchants using specific Customer Relationships Management ("CRM") software to "load balance" across affiliated accounts, thereby avoiding chargebacks thresholds. MasterCard reported through Priority and Paysafe that these CRMs had been utilized by continuity merchants to conceal load balancing and that these CRMs were actively facilitating this load balancing conduct to overcome MasterCard's rules.

### B. IPA Takes Aggressive Action to Effectively Manage GMA Through The MasterCard Audit.

34. In the face of this MasterCard audit, IPA, through the efforts of its founder Maxwell and his GMA staff, worked to effectively manage and maintain GMA's profitability.

35. IPA initiated a major push to insist that Priority obtain specific individual account-based reasons from MasterCard for closing its merchant accounts. Based upon GMA's prior experience with MasterCard audits in 2011 and 2013, IPA knew that this 2018 audit was being done on a transaction by transaction basis, and GMA insisted that Priority obtain reasons from MasterCard for closures of accounts beyond merely having a problematic CRM connection.

36. In a further effort to maintain accounts in the face of the audit, GMA also provided information and reports to Priority regarding certain merchant accounts targeted by the audit in an effort to contest the closure requests.

37. IPA also made diligent efforts to arrange for a new acquiring bank relationship for GMA for new accounts following the termination of the Priority payment processing relationship.

38. In or about March 2018, IPA initiated contact with Synovus Bank to act as a new acquiring bank for GMA. Synovus Bank started this process by sending their mutual Non-Disclosure Agreement, ISO application, and Risk Matrix requirements on June 1, 2018.

39. This approval process, including the finalization of the NDA and other documents, was ongoing in early June.

40. In addition, IPA also took the initiative to proactively propose solutions to remedy

10

the load balancing issue that prompted the MasterCard audit in the first place. Commencing in February 2018, IPA developed a software initiative to solve the load balancing issue which he took to Paysafe's VP of Risk Payment Processing. This initiative had the objective of developing software which would prevent load balancing for GMA and Paysafe merchants.

41. At the urging of IPA, Paysafe included this software initiative in its February 2018 presentation to MasterCard to address the load balancing problems. Based on MasterCard's approval, the closure of Paysafe accounts by MasterCard was stayed while this initiative was developed. This stay on account closures produced a huge benefit to Paysafe.

### V. Despite IPA's Diligent Efforts To Solve The MasterCard Audit Problem, Paysafe Acts Unilaterally To Eliminate GMA And Breach The Independent Contractor Agreement

42. While, as set forth above, IPA expended significant time and effort to develop initiatives to address and minimize the impact of the MasterCard audit on behalf of Paysafe, Paysafe did not reciprocate in supporting IPA.

43. At a meeting on May 29, 2018 in Irvine, Chazanoff as COO of Paysafe advised Maxwell that Paysafe had made the unilateral decision to eliminate GMA and combine all of its accounts with existing Paysafe merchant accounts in the Paysafe Irvine office.

44. In response, Maxwell strongly objected to this course of action and advised the Paysafe principals that GMA was in the process of obtaining a new banking relationship as well as being the driving force for the software initiative to address the MasterCard audit. Maxwell further advised Chazanoff that the continuing assistance of his staff at GMA was essential to maintaining its current accounts.

45. In addition, Maxwell advised the Paysafe principals that the continuing existence of GMA was important in obtaining a new banking relationship based upon GMA's well-respected risk management capabilities in the high-risk continuity merchant space.

46. Maxwell further stated to Chazanoff in this May 29, 2018 meeting that he estimated that GMA would have a new acquiring bank relationship in place within months, and

11

projected a return by GMA to the same profitability as prior to the MasterCard audit within a further several months.

47. In response, the Paysafe principals insisted that this unilateral change be made now, and also insisted that IPA comply with their strategy to eliminate GMA and combine its operations into Paysafe. Those principals informed Maxwell that they would not wait for GMA to obtain a new banking relationship, as they wanted results immediately.

48. Despite Paysafe's assertion that its action was based on GMA's loss of accounts due to the MasterCard audit, on information and belief, the real and undisclosed reason driving this action by Paysafe was its desire to maximize Paysafe's Initial Public Offering ("IPO") value.

49. On information and belief, in June 2018, the private equity firm Blackstone had a controlling interest in Paysafe, and Maxwell understood that Blackstone wanted to take Paysafe public by way of an IPO. As a result, on information and belief, Bain Consulting was hired to evaluate Paysafe. On information and belief, Bain found that there was brand dilution between Paysafe and GMA, and that merging the two entities would increase Paysafe's potential value in an IPO.

50. On information and belief, in these circumstances, it directly served Paysafe's interests to improve its own financial position by merging GMA's operation and revenues with its own and avoid the payments required to IPA under the Agreement. On information and belief, this action would directly increase the value of Paysafe's potential IPO.

51. As a result, on June 3, 2018 – without referencing IPA's objections to this approach – IPA received an email from Paysafe confirming that GMA would cease to exist and be combined with Paysafe "immediately" by way of the following actions:

- all GMA employees were to either move to Paysafe as Full Time Employees ("FTE") or be released with an appropriate termination package;
- the GMA Sales Team was to be combined with the Paysafe team;
- Maxwell was to report to Paysafe senior executive Ben Dalfen;
- Paysafe's COO and CFO were to "recommend changes in the relationship and

agreement (comp and otherwise) between Paysafe and Marc Maxwell".

52.   Following this directive, in early June 2018, Paysafe instituted a rebranding program with the objective of eliminating GMA and merging its operations into Paysafe, and also imposed new work locations and reporting responsibilities to Paysafe executives for all GMA staff.

53.   On June 21, 2018, Paysafe presented a new "Employment Agreement" to Maxwell purporting to establish Maxwell as an employee reporting to Paysafe executives and also eliminating and replacing the compensation arrangements set forth in the Agreement.

54.   Based upon these actions by Paysafe, on June 22, 2018, IPA properly gave notice of these breaches of the Agreement and exercised IPA's right to terminate the Agreement for Good Reason pursuant to paragraph 3.  Based thereon, IPA further requested payment of the contractual liquidated damages occasioned by IPA's termination with Good Reason as set forth in paragraph 3 of the Agreement.

55.   Based upon the calculation of the damages formula set forth in paragraph 3(c) of the Agreement together with the amount owing to IPA through the termination date, the total required payment to IPA amounted to at least $16,852,735.92 as of the effective termination date of July 9, 2018.

### VI. IPA's Claim To Liquidated Damages Is Directly Supported By The Agreement And Has Not, And Cannot, Be Cured

56.   In his June 22, 2018 letter directed to Paysafe, IPA stated the facts and events unilaterally instituted by Paysafe that formed the "Good Reason" for IPA's termination of the Agreement and the requirement for payment of the contractual liquidated damages amount set forth in Section 3(c) of the same Agreement.

57.   Specifically, the following unilateral actions by Paysafe clearly constituted (1) material breaches of the Agreement, (2) material adverse changes in IPA's duties and responsibilities, and (3) a reduction in compensation, each on its own constituting "Good Reason" for termination under paragraph 3 of the Agreement:

- Paysafe issued its June 3 directive mandating the elimination of GMA as a separate business unit entirely and requiring the combining of existing GMA operations with Paysafe sales and risk management in Irvine effective "immediately";

- Paysafe immediately thereafter instituted a re-branding initiative to eliminate GMA and to transition all GMA staff both in sales and risk management to new locations with new reporting responsibilities to Paysafe personnel;

- GMA instituted revised compensation packages for the remaining former GMA employees; and,

- Without regard to the existing Agreement, Paysafe sent Maxwell a "Employment Agreement" on June 21, 2018 purporting to eliminate his independent contractor status, establish him as an employee, drastically reduce his compensation and establish new reporting relationships.

58. Based upon the express terms of the Agreement, these actions constituted "Good Reason" requiring the payment of the stipulated loss sum set forth in Section 3(c) of the Agreement unless, if capable of cure, Paysafe operated to "cure" the events that triggered "Good Reason" within 30 days of such notice (i.e., by July 22, 2018). (Agreement, ¶ 3(e)).

59. The Agreement further provided for termination of the Agreement five days following the notice of termination for "Good Reason" if the facts and circumstances giving rise to "Good Reason" were not capable of being cured.

60. The breaches by Paysafe as set forth in IPA's June 22 letter were not curable. Even if they were somehow curable, there were no reasonable or necessary changes made to timely "cure" the breach.

61. Paysafe's unilateral action in eliminating GMA and combining its sales, operation and risk management operations with Paysafe established an incurable breach of the Agreement. The good will and industry recognition of GMA in the high-risk continuity merchant accounts industry was well-established and essential to IPA's most pressing priority to establish a new

acquiring banking relationship for the GMA business unit.

62. Paysafe at no point after the termination notice cured these breaches prior to the expiration of the 30 day cure period on July 22, 2018. In addition, prior to the end of the cure period, IPA never received any confirmation from Paysafe nor from any of his former GMA staff that any "cure" actions had been implemented.

### FIRST CAUSE OF ACTION
### (Breach of Contract)

63. Plaintiff incorporates the foregoing paragraphs as though set forth fully herein.

64. IPA and Paysafe entered into the Agreement, pursuant to which Paysafe agreed to, among other matters:

- IPA's complete control over the operation of GMA was confirmed (Agreement ¶1(a));

- IPA's complete control over GMA's operations included management of the administrative, underwriting and sales functions of the GMA business unit (*Id.* at ¶1(a));

- IPA had the right to make decisions with respect to (1) the hiring, promotion, demotion and termination of staff for the GMA business unit, (2) the compensation payable to such staff, (3) managing relationships with vendors to the unit and (4) "mutually" agreeing with Paysafe on the budget for all aspects of the GMA business unit operations. (*Id.* at ¶1(a));

- Paysafe agreed it would not "take any action that would interfere with IPA's management and operation of the GMA business unit in the ordinary course of business consistent with past practice" and further agreed that "it will not take any action with respect to the operation of the GMA business unit that could reasonably be expected to have the effect of decreasing the gross revenue or increasing the expenses of the GMA business unit". (*Id.* at ¶ 1(b));

- IPA had the right to terminate the Agreement with "Good Reason" upon 5

days' notice based upon (A) a material breach of any provision of the Agreement by the Company; (B) a material adverse change in independent contractor duties and authorities as provided for in this agreement; (C) a reduction in any element of the Consulting Fee; or (D) a relocation of independent contractor's principle place of business of more than fifty (50) miles from the location as of the effective date.  This termination right was subject to the proviso that, "to the extent curable, the Company [Paysafe] must be provided with a thirty (30) day period following the Company's receipt of such notice [of termination] to cure the event(s) that trigger Good Reason". (*Id*. at ¶ 3(e)); and,

- In the event of termination with Good Reason by IPA then, "in addition to the payment of any amounts earned by the Independent Contractor through the effective date of termination," the parties also agreed to a payment of a liquidated damages amount calculated as follows:

    > "The Company shall pay to the Independent Contractor in a lump sum within ten (10) days of the effective date of termination an amount equal to two (2) times the sum of the amount of the annual retainer, the amount of each of the last four (4) quarterly bonus payments and the amount of the last annual bonus" (*Id.* at ¶ 3(c)).

65. Paysafe breached the agreement and IPA had Good Reason to terminate the Agreement based upon:

- Paysafe' June 3 directive mandating the elimination of GMA as a separate business unit entirely and requiring the combining of existing GMA operations with Paysafe sales and risk management in Irvine effective "immediately";

- Paysafe institution immediately thereafter of a re-branding initiative to

eliminate GMA;

- Paysafe's transition all GMA staff both in sales and risk management to new locations with new reporting responsibilities to Paysafe personnel;

- Paysafe's revision of compensation packages for the remaining former GMA employees; and,

- Without regard to the existing Agreement, Paysafe's communication to Maxwell of a "Employment Agreement" on June 21, 2018 purporting to eliminate his independent contractor status, establish him as an employee, drastically reduce his compensation and establish new reporting relationships.

66. IPA acted properly in providing notice of termination for Good Reason on June 22, 2018 based upon these breaches.

67. Paysafe failed to cure these breaches within 30 days of IPA's June 22, 2018 notice of Paysafe's breaches. Paysafe further breached the Agreement by failing to properly and timely pay IPA the amount owed based upon his termination with Good Reason.

68. IPA has performed all conditions, covenants, and promises required by it to be performed in accordance with the terms and conditions of the Agreement, except those terms and conditions that have been excused or rendered impossible to perform by virtue of Paysafe's conduct.

69. As a direct and proximate result of Paysafe's breach of the Agreement, IPA has been damaged in an amount of to be determined at trial but not less than $16,852,735.92, as well as other foreseeable and consequential damages.

## SECOND CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

70. Plaintiff incorporates the foregoing paragraphs as though set forth fully herein.

71. IPA and Paysafe entered into the Agreement, pursuant to which Paysafe agreed to among other matters:

- IPA's complete control over the operation of GMA was confirmed.

(Agreement ¶1a);

- IPA's complete control over GMA's operations included management of the administrative, underwriting and sales functions of the GMA business unit. (*Id.* at ¶1(a));

- IPA had the right to make decisions with respect to (1) the hiring, promotion, demotion and termination of staff for the GMA business unit, (2) the compensation payable to such staff, (3) managing relationships with vendors to the unit and (4) "mutually" agreeing with Paysafe on the budget for all aspects of the GMA business unit operations. (*Id.* at ¶1(a));

- Paysafe agreed it would not "take any action that would interfere with IPA's management and operation of the GMA business unit in the ordinary course of business consistent with past practice" and further agreed that "it will not take any action with respect to the operation of the GMA business unit that could reasonably be expected to have the effect of decreasing the gross revenue or increasing the expenses of the GMA business unit". (*Id.* at ¶ 1(b)); and,

- IPA had the right to terminate the Agreement with "Good Reason" upon 5 days' notice based upon (A) a material breach of any provision of this Agreement by the Company; (B) a material adverse change in independent contractor duties and authorities as provided for in this agreement; (C) a reduction in any element of the Consulting Fee; or (D) a relocation of independent contractor's principle place of business of more than fifty (50) miles from the location as of the effective date. This termination right was subject to the proviso that, "to the extent curable, the Company [Paysafe] must be provided with a thirty (30) day period following the Company's receipt of such notice [of termination] to cure the event(s) that trigger Good Reason". (*Id.* at ¶ 3(e)).

72. Plaintiff entered into the Agreement with the understanding and expectation that

18

Defendants would act in good faith and deal fairly pursuant to the terms of the agreement.

73.     Paysafe breached the implied covenant of good faith and fair dealing and deprived IPA of the benefits of the Agreement by:

• Eliminating GMA in its entirety and merging it into Paysafe, thereby eliminating IPA's right to operate GMA and maximize IPA's profitability from its operations; and,

• Cancelling control of IPA over GMA's staff and reassigning such staff to Paysafe, thereby, among matters, depriving IPA of the necessary ability to utilize such staff to arrange a new acquiring bank relationship.

74.     As a direct and proximate result of Paysafe's breach of the implied covenant of good faith and fair dealing, IPA has been damaged in an amount of to be determined at trial, as well as other foreseeable and consequential damages.

## **JURY DEMAND**

75.     Plaintiff demands a trial by jury.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, IPA prays for judgment against Paysafe and Does 1 through 10 as follows:

1. For general damages according to proof, but not less than $16,852,735.92;
2. For special damages according to proof;
3. For pre-judgment and post-judgment interest as permitted by law;
4. For costs of suit as allowed by law; and,
5. For such other and further relief as the Court deems just and proper.

DATED: February 1, 2019

Kravitz, Schnitzer & Johnson, Chtd.

By: *Adam J. Wax, Esq.*
    MARTIN J. KRAVITZ, ESQ.
    ADAM J. WAX, ESQ.
    *Attorneys for Plaintiff*
    *International Payment Advisors LTD*

GLASER WEIL FINK HOWARD
  AVCHEN & SHAPIRO LLP

    PATRICIA L. GLASER
    SEAN RILEY
    MICHAEL E. GERST
    *Attorneys for Plaintiff*
    *International Payment Advisors LTD*