# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

***

| | |
|---|---|
| INTERNATIONAL PAYMENT ADVISORS LTD, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>PAYSAFE SERVICES (US) LLC, a Delaware Corporation; and DOES 1-10 inclusive.,<br><br>Defendants.<br><br>AND RELATED CROSS-ACTION. | 2:19-cv-00203-VCF<br>**PRETRIAL ORDER** |

Pretrial Order, ECF No. 154, is APPROVED.

This case is set for jury trial on a stacked calendar on May 22, 2023, at 9:00 AM.  Calendar Call will be held at 10:00 AM on May 8, 2023, in Courtroom 3D.

Dated this 4th day of August 2022.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE

1

## I.   CONCISE STATEMENT OF NATURE OF THE ACTION AND PARTIES' CONTENTIONS

### A.   Contentions Of Plaintiff International Payment Advisors Ltd and Counter Defendant Marc Maxwell (collectively "IPA/Maxwell")[1]

This case is simple and straightforward. Defendant and Counter Defendant Paysafe Services (US) LLC now known as Global Merchant Advisors LLC ("Paysafe US")[2] breached the Independent Contractor Agreement ("ICA") entered into with Plaintiff and Counter Defendant International Payment Advisors Ltd ("IPA"), triggering an unequivocal obligation under the ICA to pay IPA roughly $4 million in deferred annual bonus payments that (by Paysafe US's own admission) IPA had already earned prior to termination of the ICA, and many millions more in liquidated damages. Paysafe US unapologetically refuses to honor the terms of the parties' agreement.

---

[1] IPA and Maxwell refer to themselves collectively herein as "IPA/Maxwell" for convenience of the Court and parties only. And while Paysafe US contends IPA and Maxwell are alter egos, that is not the case, and Paysafe US cannot make the showing required to prove its alter ego allegation.

[2] The parties have been unable to reach agreement as to a common descriptor for the Defendant/Counter-Claimant in this action.

Plaintiff and Counter-Defendants IPA and Maxwell propose the use of the descriptor "Paysafe US" to refer to the Defendant/Counter-Claimant. This proposal is based on the following: a) the named party to the contract at issue in this litigation is Paysafe Services (US) LLC, b) the named Defendant in this action is Paysafe Services (US) LLC, c) the contemporaneous documents in this case refer to Defendant/Counter-Claimant as "Paysafe," d) the contemporaneous documents in this case do not refer to Defendant/Counter-Claimant as "GMA LLC", and e) the use of the term "GMA LLC" will confuse the jury because it is very similar to the name of the business unit at issue in this case –the GMA business unit of Defendant/Counter-Claimant.

Defendant/Counter-claimant Global Merchant Advisors LLC responds as follows: The defendant in this action is "Global Merchant Advisors LLC." That was its name when the agreement at issue was signed, when it was sued, and now. As a result, defendant should be referred to as Global Merchant Advisors LLC or GMA LLC. Maxwell's proposal to use the name "Paysafe US" may cause confusion to a jury as it is substantially similar to the names of third parties to this lawsuit "Paysafe Service (US) Corp.", "Paysafe Partner LP" and "Paysafe Group." A party is not permitted to make up a name for its adversary to further its advocacy, much less force the other party to use that made up name. We also note that, contrary to Maxwell's assertion, the name GMA was used by GMA LLC's employees throughout the period at issue, including in their signature blocks.

The parties request the opportunity to argue their respective positions on this issue to the Court so that the proper descriptor can be decided by the Court for purposes of trial.

### 1.   <u>The Parties Enter Into The ICA</u>

In 2010, Marc Maxwell and a partner formed GMA, Inc GMA, Inc. quickly became a highly successful sub-ISO in the high risk payment segment of the payment processing industry, specializing in credit card transactions involving continuity merchants (*i.e.*, merchants that offer services or products based on a subscription or recurring payment basis). In 2014, Paysafe US acquired GMA, Inc. and Marc Maxwell continued to manage what became the GMA business unit of Paysafe US. GMA's profits steadily increased, and by 2016 Paysafe US sought to renegotiate its deal with Marc Maxwell to avoid Maxwell leaving to start a competitor company.

After more than a year of intensive negotiations, in July 2017 IPA (an LLC with Marc Maxwell as a member) and Paysafe US entered into the ICA. IPA's compensation under the ICA was based on the profitability (specifically, EBITDA) of the GMA business unit. Consequently, to avoid interference or manipulation by Paysafe US that could depress IPA's compensation, and given that Maxwell was foregoing the opportunity to start his own competitor company, the ICA contains numerous provisions designed to ensure that the GMA business unit would be managed and controlled by IPA alone. For example, the ICA expressly states that IPA will manage, and have "complete control" (subject to two exceptions not relevant here) over the operations of the GMA business unit of Defendant Paysafe US. It also states that Paysafe US will not interfere with IPA's management and operation of the GMA business unit in the ordinary course of business consistent with past practice. It further states that Paysafe US will not take any actions that could reasonably be expected to reduce the revenue of the GMA business unit. And the ICA gives IPA the express right to terminate the ICA with Good Reason (and recover liquidated damages) upon the occurrence of **<u>one or more</u>** of the following events without IPA's prior written consent:

1. A material breach of the ICA by Paysafe US; or

2. A material adverse change in IPA's duties and authority as provided for in the ICA.

3. a reduction in any element of [IPA's] Consulting Fee, or

4. a relocation of [IPA's] principal place of business of more than 50 miles from the location as of the Effective Date

2164397

*ACTIVE 66528800v1*

1    **2.     Paysafe US Breaches The ICA And IPA Terminates The Agreement**

2        In late May 2018, Paysafe US advised IPA and Marc Maxwell that IPA would no longer

3    manage the GMA business unit, that the GMA business unit would be eliminated, and that the GMA

4    business unit's operations would be combined with, and managed by, Paysafe Irvine. Marc Maxwell

5    objected to this course of action repeatedly, both orally and in writing, but delayed further action

6    while he waited to see whether Paysafe US made good on its promise to provide an alternative

7    arrangement that would make IPA and Marc Maxwell whole. On June 21, 2018, Paysafe US sent

8    Marc Maxwell a purported employment agreement that was wholly unacceptable for a variety of

9    reasons, including the fact that it provided for much reduced compensation compared with the ICA.

10       On June 22, 2018, IPA sent Paysafe US a letter providing notice of its intent to terminate the

11   ICA with Good Reason, citing Paysafe US's unauthorized assertion of control over the GMA

12   business unit (in violation of the ICA's "complete control" clause), its removal of IPA as manager,

13   and its elimination of the GMA business unit (in violation of the ICA's express requirement that

14   Paysafe not take any action that would be expected to reduce the GMA business unit's revenues).

15   Each of these Paysafe US acts (none of which were subject to prior written consent by IPA, and

16   **each** of which is repeatedly acknowledged in Paysafe US's own documents) **constituted an**

17   **independent and sufficient ground for IPA to terminate the ICA with Good Reason**, because

18   each of these Paysafe US acts constituted a material breach of the ICA, a material adverse change in

19   IPA's duties and authority as provided for in the ICA, and/or a reduction in IPA's Consulting Fee

20   (which was based on the GMA business unit's EBITDA).

21       The ICA, in Section 3.b., expressly states that upon the ICA's termination for any reason,

22   "[a]ny amounts earned by Independent Contractor through the effective date of termination,

23   including . . . future installment payments of annual bonuses for already completed fiscal years . . .

24   shall be paid to [IPA]." Paysafe US's own internal documents concede that at the effective date of

25   termination, IPA had earned and was owed future installment payments of annual bonuses worth in

26   excess of $3 million. To date, Paysafe US has refused to pay these annual bonus installment

27   payments (which Paysafe's own damages expert calculates to total $3.899 million, before pre-

28   judgment interest), despite its clear obligation to do so under the ICA.

5

PRETRIAL ORDER

1    The ICA also states, in Section 3.c., that if IPA terminates with Good Reason, "the Company

2  shall pay to the Independent Contractor, in a lump sum, within ten (10) days of the effective date of

3  termination, an amount equal to two (2) times the sum of the amount of the annual retainer, the

4  amount of each of the last four (4) quarterly bonus payments, and the amount of the last annual

5  bonus in addition to any amounts already earned."  Under this formula, IPA is owed in excess of

6  $15 million, before pre-judgment interest. To date, Paysafe US has refused to pay any of this

7  amount, despite its clear obligation to do so under the ICA.

8         **3.    Paysafe US's Purported Defenses Are Baseless**

9    Paysafe US has asserted a succession of misplaced arguments in an attempt to avoid its

10  contractual obligations. But these arguments are contrary to the plain language of the ICA, contrary

11  to the undisputed evidence, and contrary to controlling law.

12    Paysafe US asserts that IPA somehow acquiesced to Paysafe US's breaches of the ICA,

13  including the elimination of the GMA Business unit. As a preliminary matter, this has no bearing on

14  Paysafe US's obligation to pay IPA roughly $4 million in deferred annual bonus payments that (by

15  Paysafe US's own admission) IPA had already earned prior to termination of the ICA. The ICA

16  clearly states that upon termination for any reason "[a]ny amounts earned by Independent

17  Contractor through the effective date of termination, including . . . future installment payments of

18  annual bonuses for already completed fiscal years . . .  shall be paid to Independent Contractor."

19  ICA, Section 3.b.  It is undisputed that the ICA is terminated. Moreover, the record is clear that IPA

20  (through Marc Maxwell) objected to this course of action repeatedly, both orally and in writing, and

21  only delayed further action while he waited to see whether Paysafe US made good on its promise to

22  provide an alternative arrangement that would make IPA and Marc Maxwell whole. In addition,

23  Paysafe US's acquiescence argument is nonsensical. As one Paysafe US executive stated in an

24  internal email, the ICA is a "rock solid" and lucrative agreement; thus, IPA and Maxwell had no

25  incentive to acquiesce to Paysafe US's breaches absent an agreement to make IPA and Maxwell

26  whole. Finally, Paysafe US's acquiescence argument is a non-starter because the ICA expressly

27  states that any modification of the agreement or waiver of grounds for termination must be in

28  writing, and no such writing exists.  *See* ICA Section 3.e (grounds for termination exist if they did

6

2164397

*ACTIVE 66528800v1*

1  not occur with IPA's "prior written consent'); ICA Section 16 ("The terms and provisions of this

2  Agreement may not be modified or amended except in a writing executed by both of the parties

3  hereto.")

4      Paysafe US also argues that IPA did not have complete control over the GMA business unit

5  and that this somehow defeats IPA's claims. Again, this is a *non sequitur* as it relates to IPA's claim

6  for more than $4 million (plus pre-judgment interest) in unpaid annual bonus installment payments.

7  As explained above, these amounts are unequivocally due on termination of the ICA.

8      In addition, breach of the "complete control" clause is only one of several independent

9  grounds that support IPA's termination of the ICA and entitlement to liquidated damages. For

10  example, the ICA expressly states that IPA is entitled to terminate the ICA and collect liquidated

11  damages if there is a "material adverse change in IPA's duties and authority as provided for in the

12  ICA" or "a reduction in any element of [IPA's] Consulting Fee." Both of these grounds for

13  termination are clearly present here (in fact, Paysafe US by its own admission completely eliminated

14  the GMA business unit), regardless of whether the ICA's complete control clause has been

15  breached.

16      And, in any event, Paysafe's control argument is at war with the plain language of the ICA,

17  which expressly states that IPA has **"complete control"** over the management of the GMA business

18  unit, *see* ICA, Section 1.a. (Emphasis added.) The two exceptions to this provision (Paysafe US and

19  IPA must agree on a budget, and IPA is subject to a delegated authority matrix concerning risk

20  issues) do not provide a basis for IPA to take over the GMA business unit and eliminate it, and it

21  would be absurd to argue otherwise. As for Paysafe US's contention that in practice the GMA

22  business unit operated under Paysafe US's control, Paysafe US improperly asks that the "complete

23  control" provision be read out of the ICA. And Paysafe US ignores the fact that its own documents

24  and witnesses acknowledge that the GMA business unit was an independently managed business

25  unit under the "complete control" of IPA, with its own independent risk policies, and did not report

26  to the Paysafe US credit committee.

27      Paysafe US also asserts that it cured its breaches of the ICA, and thus IPA's termination was

28  not for Good Reason. Again, this has no impact on IPA's claim for more than $4 million (plus pre-

7

PRETRIAL ORDER

judgment interest) in unpaid annual bonus installment payments, because these annual bonus installment payments must be paid to IPA even if IPA's terminated without Good Reason (*i.e.*, if Paysafe had cured its breaches and IPA terminated anyway).  Moreover, Paysafe US's breaches were incurable as a matter of law because they involved breaches of non-monetary covenants (which are historical facts that cannot be undone).  *See, e.g., In re BankVest Capital Corp.*, 360 F.3d 291, 299 (1st Cir. 2004) (non-monetary defaults are historical facts that are impossible to cure); *In re Deppe*, 110 B.R. 898, 904 (Bankr.D.Minn.1990) (same)*; Manpower Inc. v. Mason*, 377 F. Supp. 2d 672, 677 (E.D.Wis. 2005) (franchise agreement case defining "incurable breach" as "one that cannot logically be cured, such as a franchisee's failure to meet a sales quota within a specified time"); *Young Travelers Day Camps, Inc. v. Felsen*, 118 N.J. Super. 304, 314 (N.J. Super. 1972) (month-long failure to perform under franchise agreement was incurable breach: "The breach was not merely material, it was irreparable; the campers which had not been obtained by the beginning of July could not be supplied thereafter."); *Matter of GP Airlines, Inc*., 200 B.R. 222 , 233 (Bankr. D. Neb. 1996) (incurable breach of Airline Interline Agreement: "GP Express has failed to meet performance standards relating to the completion of flights, the timely arrival of flights, and the utilization of Airline Clearing House accounting services. These breaches are historical and, by definition, cannot be cured.").  Paysafe US's breaches are also incurable because they went to the essence of the parties' contract and thus destroyed trust between the parties. *See, e.g., LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 641 (2009) (breaches that went to the fundamental essence of the contract or destroy trust are incurable); *K. Comstock & Co., Inc. v. United Engineers & Constructors Inc*., 880 F.2d 219, 232 (9th Cir. 1989) (same); *In re Best Film and Video*, 46 B.R. 861, 875 (Bkrtcy.E.D.N.Y.1985) (same); *Falls v. State Farm Ins. Mut. Auto Ins. Co*., 774 F. Supp. 2d 705, 712 (M.D. Pa. 2011) (same); *Dix v. Atos IT Solutions and Services, Inc*., 2021 WL 1165762 at *8 (S.D. Ohio, Mar. 25, 2021) ("a breach of such a contract would be incurable if the nature of the breach so severely damages the relationship between the parties as to make it impossible for the parties to continue working together in the way the contract contemplates, no matter what ameliorative steps the breaching party takes.").; *Jorgensen v. United Comm'ns Grp. Ltd. P'ship*, No. 8:10-cv-00429, 2011 WL 3821533, at *7 (D. Md. Aug. 25, 2011) (employee who appropriated

proprietary information and booked revenue from orders that had not been finalized caused a "loss of faith and trust in" in the employee that the employer "reasonably deemed to be incurable.")

And even if Paysafe US's breaches had been curable (they were not) Paysafe US's purported attempts to cure its numerous breaches were untimely, incomplete, and ineffective.  For example, Paysafe US did not even offer to compensate IPA for the lengthy time period when it was stripped of its contractually-mandated control over the management of the GMA business unit.

Paysafe US also argues that the ICA's "ordinary course of business" covenant gave Paysafe US an "implied inverse right" to take over management of the GMA business unit because the industry-wide Mastercard audit purportedly caused the GMA business unit to operate outside the ordinary course of business. This argument fails for a host of reasons. First, the ICA's "ordinary course of business" covenant is a negative covenant that does not give Paysafe US any affirmative rights. Second, there is no allegation that IPA engaged in fraud or ultra vires activity, as required under California law (and the understanding of both sides' lead negotiators) to show that a company or person operated outside the ordinary course of business. Third, Paysafe US's reliance on the Mastercard audit is a *non sequitur*, because the ordinary course of business covenant concerns **IPA's conduct** (its "management and operation of the GMA business unit"), not exogenous events such as the Mastercard audit. Fourth, even if the ordinary course of business clause applied to disruption caused by exogenous events such as the Mastercard audit (it does not), revenue fluctuation, audits, and account shutdowns were regular occurrences in the high risk sector of the payment processing business, and thus were well within GMA's ordinary course of business even under Paysafe's erroneous construction of that term. Fifth, Paysafe US never asserted a breach of the "ordinary course of business" clause until **after** IPA terminated the ICA in June 2018, despite Paysafe US's contention that the GMA business unit was operating outside the ordinary course of business no later than February 2018. Paysafe US's reliance on the "ordinary course of business" *ex post facto* justification for Paysafe US's breaches of the ICA. In fact, Paysafe US internal documents show that Paysafe US had been planning to take control of the GMA business unit away from IPA and Maxwell before the Mastercard audit had started, and that Paysafe US's reliance on the Mastercard audit as a basis to take over the GMA business unit is clearly pretextual.

9

Paysafe US further argues that it is excused from its obligations under the ICA because IPA allegedly committed a prior breach of the ICA (including the implied covenant of good faith and fair dealing) and acted with unclean hands. But under both California law and the terms of ICA, Paysafe US waived any claim of prior breach (or defenses based on alleged IPA breaches, such as unclean hands) by failing to  provide timely notice of any alleged IPA breach and by electing not to terminate the ICA under its express termination provisions upon discovery of any alleged IPA breach. *Fifty-Six Hope Road v. Jammin Java Corporation*, 2017 WL 2457487 (C.D. Cal. 2017) ("a party cannot retroactively avoid performance by claiming the opposing party had previously breached without complying with the clear requirements of the written agreement regarding termination or suspension of performance."). In addition, Paysafe US's prior breach defense and related defenses are based on allegations that IPA should have taken different actions in managing the GMA business unit, but the ICA gave IPA extremely wide discretion ("complete control") in how it managed the GMA business unit. Thus, Paysafe US's allegations of mismanagement, even if true, would not support a claim for breach of the ICA, let alone meet the much higher "bad faith" standard required to prove unclean hands or breach of the implied covenant of good faith and fair dealing.

And, in any event, IPA did **not** mismanage the GMA business unit. Under IPA's management, the GMA business unit repeatedly generated eight-figure annual profits, and was among the most profitable of Paysafe business units. Even in 2018, when Paysafe US claims GMA's business suffered diminished results in the aftermath of the Mastercard audit, the financials relied on by Paysafe US's own damages expert shows that the GMA business unit **still generated net profits in excess of $5 million in the five months it was managed by IPA**.[3]

And it is undisputed that IPA made repeated efforts to mitigate the effects of the Mastercard audit, including pursuing a software solution for the load balancing issue that prompted the

---

[3] Paysafe US's contention that IPA somehow forfeited more than $20 million in contractually-mandated damages because Maxwell took a vacation is ridiculous. Among other things, Paysafe US ignores the fact that under the plain language of the ICA that agreement terminated five days after IPA gave notice of termination, and Maxwell's vacation was post-termination.

1   Mastercard audit, and actively pursuing a new banking relationship. For example, once Priority

2   paused boarding new accounts in February 2018, Maxwell initiated and worked directly with

3   Paysafe US through June 19, 2018 to develop a technology (called a gateway or CRM) that would

4   alleviate the "load balancing" issue that caused the audit in the first place. Internal Paysafe US

5   communications reference these efforts as a strategy demonstrating Paysafe US's commitment to

6   combat load balancing, and state that Mastercard "signed off" on this proposed solution. And while

7   Paysafe US ultimately decided not to go with Maxwell's proposed plan (over Maxwell's

8   objections), this does not change the fact that Maxwell worked tirelessly to find a solution to this

9   key issue.

10      Similarly, Paysafe US's assertion that IPA and Maxwell somehow breached the ICA by

11  purportedly delaying efforts to obtain a new bank is belied by the fact that, as Paysafe US's own

12  internal emails and analysis confirm, finding banks to service high risk accounts following the

13  Mastercard audit was extremely difficult. In fact,  Paysafe US wanted another bank to service its

14  Paysafe Irvine high risk accounts and experienced difficulty in finding one.

15      Simply put, Paysafe US's prior breach allegations are inadmissible post hoc fictions.

16      Finally, Paysafe US's assertion that the ICA's liquidated damages is invalid is a non-starter.

17  None of the supposed "facts" Paysafe US now relies on were raised in Paysafe US's pleading or

18  relevant interrogatory response, and thus cannot be raised at trial. Paysafe US's invalidity argument

19  also fails because Paysafe US has not alleged, and cannot prove, that IPA used market power in a

20  relevant market to coerce Paysafe US into accepting the ICA's liquidated damages clause. *See*

21  *Constellation-F, LLC v. World Trading 23, Inc.*, 45 Cal.App.5th 22, 28 (2020) (to invalidate a

22  liquidated damages clause under California law, one must show "oppressive coercion" based on

23  market power in a relevant market). And Paysafe US's contention that IPA's payout under the

24  liquidate damages clause does not reflect a reasonable estimate at the time of contracting of the

25  range of damages IPA would likely suffered in the event it terminated the ICA with Good Reason is

26  simply absurd. Absent the liquidated damages clause, IPA's damages would have been the profits it

27  would have generated absent termination. *Travelodge Hotels, Inc. v. Kim Shin Hospitality, Inc.*, 27

28  F.Supp.2d 1377 (M.D. Fla. 1998) (applying California law "[t]he resulting harm from the premature

termination would be lost future profits."); *Radisson Hotels Intern., Inc. v. Majestic Towers, Inc.*, 488 F.Supp.2d 953 (C.D. Cal. 2007) ("Functionally, this provision requires Majestic to indemnify Radisson's lost profits in the event that the License Agreement is terminated due to Majestic's failure to pay past royalty fees."); *Century 21 Real Estate LLC v. RealtyComp.com*, 2015 WL 1009660 (N.D. Cal. 2015) (plaintiff entitled to recover lost profits arising from plaintiff's contractual early termination of agreement based on defendants' breach). Since the ICA's term is **<u>indefinite</u>**, IPA's payout under the liquidated damages clause --  which is equal to merely two times IPA's compensation over the last full year before the ICA was terminated -- was a very conservative estimate at the time of contracting for IPA's likely damages. *Travelodge Hotels,* 27 F.Supp.2d at 1383 ("The computation of damages based on five years worth of franchise payments is not unreasonable considering the License Agreement's unexpired term of eighteen years.").

As for Paysafe US's authorities regarding liquidated damages, they are inapposite for a host of reasons. Among other things, Paysafe US's "one-size-fits-all" authorities are outdated, do not address the current liquidated damages invalidity test, (unlike here) do not involve contractual early termination clauses, and (unlike here) do not involve breaches of material contract terms.

In sum, Paysafe US's multiple breaches of the ICA are clear, and its defenses are without merit.

**B.     <u>Statement of Action/Contentions by GMA LLC</u>**

This litigation involves an independent contractor agreement (the "***ICA***") between the plaintiff/counter-defendant, International Payment Advisors, Ltd. ("***IPA***"), and the defendant/counterclaimant now known as Global Merchant Advisors, LLC ("***GMA LLC***").[4]   More specifically, however, this case centers around the self-dealing of Marc Maxwell ("Maxwell") and his mismanagement (acting and contracting through his alter ego IPA[5]) of GMA LLC's  wholly

---

[4]   GMA LLC was formerly known as Paysafe Services (US) LLC, which is the named defendant in the case.

[5]   As Maxwell testified: Maxwell was IPA's sole employee, sole member, sole owner and sole authorized signatory; IPA's "office" was in Maxwell's Las Vegas residence; IPA had no assets other than Maxwell's talent. Maxwell determined when he would receive funds from IPA, and in what amounts; all IPA's money ultimately went to Maxwell; Maxwell used IPA's bank account to pay for non-business expenses, such as cosmetic dentistry, mattresses, gifts and loans to family members, and

2164397
*ACTIVE 66528800v1*

owned asset, referred to – in the ICA as well as herein – as "the GMA business unit."

As manager of the GMA business unit, Maxwell received contractual compensation under the ICA based on the GMA business unit's performance, specifically its EBITDA. [6]   While the GMA business unit was highly profitable from 2014 until the last quarter of 2017, Maxwell was paid many millions of dollars in compensation by GMA LLC.  In early 2018, however, the GMA business unit's performance and EBITDA suffered a calamitous decline (as shown below, in no small part due to Maxwell's own actions and inactions).  When Maxwell realized he consequently would no longer receive the millions of dollars in annual compensation he had grown accustomed to, instead of acting in the best interests of the GMA business unit he was hired to manage, he manufactured a claim of "breach" of the ICA by GMA LLC in a disingenuous attempt to trigger the ICA's liquidated damages clause so as to reap one final and unwarranted windfall payment from GMA LLC.

In short, GMA LLC did not breach the parties' agreement.  Rather, it was Maxwell who repeatedly breached the ICA, as well as the duty of good faith and fair dealing required by California law. [7]   For all these reasons, Maxwell cannot now recover any damages under the ICA.

### GMA LLC's "GMA business unit"

Maxwell was first hired as an employee to manage the GMA business unit in 2010 by its previous owner. [8]   When GMA LLC acquired the GMA business unit assets in mid-2014, GMA LLC offered a new employment agreement to Maxwell to continue in that identical role, which Maxwell accepted.  In 2017, at Maxwell's request, GMA LLC agreed to enter into the ICA with Maxwell's wholly-owned company and alter ego, IPA, as a replacement for the 2014 employment

---

other purposes not tied to IPA's operations.  In sum, Maxwell was IPA, and vice versa.

[6]   "EBITDA", or earnings before interest, taxes, depreciation, and amortization, is a measure of a business unit's overall <u>financial performance</u> and is used as an alternative to <u>net income</u> in certain circumstances.

[7]   Under the express terms of the ICA, "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to its principles of conflicts of laws."

[8]   The GMA business unit assets were purchased by GMA LLC from a company called Global Merchant Advisors, Inc., which is an entirely separate and unaffiliated legal entity (now dissolved) from the GMA LLC that is defendant in this case.

13
PRETRIAL ORDER

contract.  However, it is not disputed that the relationship between GMA LLC (or, prior to mid-2014, his predecessor employer) and Maxwell remained essentially unchanged from 2010 until June 2018 when Maxwell abruptly quit his engagement with GMA LLC.  It is also beyond dispute that at all times since its purchase of the GMA business unit in mid-2014, GMA LLC has been the sole owner of the GMA business unit.  Prior to GMA LLC's acquisition of these assets, they were owned by Maxwell's previous employer, an entity in which, again, Maxwell had no ownership interest. Consequently, though Maxwell has represented to this Court that GMA LLC sought to "capture IPA's portion of [the GMA business unit's] future revenue stream," Maxwell never owned any portion of the GMA business unit or its revenue stream, all of which have always been owned exclusively by GMA LLC or the entity from which GMA LLC purchased the assets.

**Maxwell Forces a Shift in His Relationship with GMA LLC from an Employee Managing the GMA Business Unit to a Supposed Independent Contractor**

At the time of GMA LLC's acquisition of the GMA business unit assets in mid-2014, Maxwell had been an employee of the prior owner with no ownership interest in the GMA business unit. After GMA LLC's acquisition of the GMA business unit, Maxwell then continued in his role as an employee/manager per a written employment agreement with GMA LLC, and continued to be charged with the day-to-day management of the GMA business unit subject to oversight and approval by GMA LLC.

Eventually, Maxwell became dissatisfied with his compensation (based on a salary) and demanded a new arrangement (i) with his compensation tied to the EBITDA of the GMA business unit rather than a salary, and (ii) in which, to gain tax benefits, Maxwell would be classified as an "independent contractor" through his wholly owned limited liability company, IPA.  During the negotiation, Maxwell threatened (i) to file a lawsuit against GMA LLC for supposed "breach" of a mere prior negotiation proposal (to which the parties had not agreed) and (ii) to start a competing business using GMA LLC's employees, if (iii) GMA LLC did not sign the new draft agreement that Maxwell had just sent (proposing new terms never before seen in a prior draft).  The parties then signed and entered into the ICA at issue in this case.

2164397

*ACTIVE 66528800v1*

**The ICA and Its Allocation of Authority**

To be clear, as he himself concedes, Maxwell's breach of contract claim rests entirely on his contention that he – and he alone – had complete control of the GMA business unit per the terms of the ICA. But it is clear that the ICA never provided Maxwell with any such "complete control" as Maxwell now contends.[9]

To the contrary, the ICA provided that Maxwell, through his alter ego IPA, would continue to have authority to manage the day-to-day operations of the GMA business unit – precisely as he had done since 2010 as an employee/manager – so long as the GMA business unit continued to operate "in the ordinary course of business consistent with past practice."  And even then, under so-called "ordinary course" circumstances, Maxwell's management authority was not without significant limits.  For example, Maxwell was unable to budget any amounts for operation of the GMA business unit without GMA LLC's approval. Similarly, as Maxwell concedes, Maxwell had no authority to enter into significant contracts on behalf of the GMA business unit: "I didn't feel that the ICA gave me, necessarily, authorization to enter GMA into contractual agreement. . . . Entering into a new contract was not a part of [the ICA]." Indeed, Maxwell testified that his authority under the ICA was consistent with his previous authority as employee/manager of GMA LLC, when plainly he was subordinate to the owners and directors of GMA LLC to whom he likewise testified he reported under the ICA.  Both in writing and in practice, the ICA did not give Maxwell "full

---

[9]  The specific provision of the ICA that Maxwell relies upon is Section 1, which states, in its entirety:

"a.    Independent Contractor shall manage, and have complete control over the operation of, the business unit of the Company referred to as "GMA" ***consistent with the Company's delegated authority matrix (the "Services")***.  The authority vested in the Independent Contractor in performing the Services shall include, but not be limited to, management of the administrative, underwriting and sales functions of the GMA business unit, such as: making decisions with respect to the hiring, promotion, demotion and termination of employees and independent contractors working for the GMA business unit, and the compensation to be paid to the same; managing relationships with vendors doing business with the GMA business unit; and ***mutually agreeing with the Company [GMA LLC] on the budget for all aspects of the operation*** of the GMA business unit.

b.    The Company hereby agrees that it will not take any action that would interfere with the Independent Contractor's management and operation of the GMA business unit ***in the ordinary course of business consistent with past practice***.  The Company further agrees that it will not take any action with respect to the operation of the GMA business unit that could reasonably be expected to have the effect of ***decreasing the gross revenue or increasing the expenses of the GMA business unit***." [Emphasis added.]

2164397
*ACTIVE 66528800v1*

1   control" over GMA LLC's asset, even in ordinary circumstances, as Maxwell now claims.

2       More importantly for purposes of this case, however, Maxwell's day-to-day management

3   authority under the ICA did not extend to circumstances in which the GMA business unit was

4   operating "outside its ordinary course of business consistent with past practice."  As evidenced

5   below, by early 2018, the GMA business unit was facing imminent financial ruin, and, far from

6   operating in "the ordinary course of business consistent with past practice", was close to not

7   operating at all.

8       **Early 2018: GMA LLC Is Operating Outside Its Ordinary Course of Business**

9       **Consistent with Its Past Practice**

10       The GMA business unit provides credit card processing services for certain high risk

11   merchant verticals – most notably for merchants that sell products known as "nutraceuticals" [10].

12   Notably, GMA LLC's parent company, Paysafe Group, [11]  has also long provided payment

13   processing for nutraceutical merchants through a separate subsidiary (referred to herein as "Paysafe

14   Irvine"), which, like GMA LLC, is also based in Irvine, California.

15       In late 2017 and early 2018, Mastercard conducted an unprecedented industry-wide audit of

16   companies that process payments in this industry segment, including of Paysafe Irvine, and of

17   Priority Payment Systems ("Priority") [12]  and its sub-ISOs (including the GMA business unit).

18   Importantly, at all times up to the signing of the ICA (and, in fact, until early 2018), the GMA

19   business unit was a sub-ISO (i.e., a third party sales agent) to Priority, which relationship enabled

20

21

---

22  [10]  The term "nutraceutical" can be defined as any type of food or fortified food product that is used to supplement a diet, prevent illness or maintain health, including but not limited to dietary supplements, weight loss supplements, herbal products, skin care and other topicals, etc.  Visa and Mastercard considers this to be a high risk merchant vertical because (i) unlike pharmaceuticals, nutraceuticals are tested and regulated under a different set of guidelines than those covering "conventional" foods and drug products, and (ii) these products are sold exclusively through e-commence or "card-not-present" transactions.  Consequently, profit margins for processing companies tends to be higher in this vertical than in other non-high risk verticals.

26  [11]  GMA LLC is a wholly owned subsidiary of Paysafe Group. Paysafe Group is a provider of a comprehensive array of payment solutions, including card processing, digital wallets and e-cash, throughout Europe, North America and Latin America.  Its ultimate parent company, Paysafe Limited, is a publicly traded company listed on the New York Stock Exchange (NYSE:PSFE).

28  [12]  Priority is a third party payment service provider, unaffiliated to any of the parties in this litigation.

*ACTIVE 66528800v1*

1   the GMA business unit to obtain access to a sponsoring bank – without which no card payment

2   service provider like GMA LLC can operate.  As is undisputed by Maxwell, the GMA business

3   unit's relationship with Priority was uniquely profitable for the GMA business unit and was the

4   foundation of its business. Maxwell's own industry expert has correctly opined and testified: "[this

5   favorable] arrangement between GMA and Priority represented the predominant arrangement for

6   boarding of GMA merchants and the lucrative recovery of revenues from this arrangement based

7   upon the split was a major motivating factor in [GMA LLC]  negotiating and entering into the ICA."

8          The results of the audit were catastrophic for the GMA business unit.  The audit resulted in

9   the shutdown of nearly 80% of the GMA business unit's existing merchant customer accounts.

10  Even more fundamentally, as a result of the audit, Priority terminated its relationship with the GMA

11  business unit, without which, the GMA business unit lost its ability to book any new business.  The

12  Priority relationship had been the foundation of the GMA business unit since its inception, and the

13  GMA business unit had never existed without it. This alone took the GMA business unit outside of

14  its ordinary course of business and, without the lucrative Priority relationship it had always relied

15  upon, left the GMA business unit operating in a manner that was not consistent with its past

16  practice.  To the contrary, as of February 2018, the GMA business unit was but a shell of its former

17  self, having lost 80% of its prior merchant base (with such losses only mounting every day) and

18  without any foreseeable prospects for securing a new sponsor bank or any new merchant customers.

19          Making matters worse still, in response to these catastrophic consequences, Maxwell – who

20  was supposed to be managing the GMA business unit (under the express terms of the ICA, Maxwell

21  was "to manag[e] relationships with vendors doing business with the GMA business unit")  – failed

22  to ever meet with even a single bank to replace the banking relationship it had lost through its prior

23  sales agent relationship with Priority.

24          Meanwhile, Paysafe Irvine, GMA's sister company, had passed through the Mastercard audit

25  relatively unscathed.  Indeed, Paysafe Irvine emerged from the audit with its sponsor bank

26  relationship – with Woodforest National Bank ("Woodforest") – and the vast majority of its

27  merchant customers firmly intact.

28          Yet, inexplicably, Maxwell resisted instructing the GMA business staff he managed to write

17

PRETRIAL ORDER

new business to their only remaining option – through GMA LLC's sister company Paysafe Irvine's banking relationship with Woodforest.  According to Maxwell, the GMA business unit failed or refused to utilize this only remaining opportunity to book through Woodforest because, ostensibly, Maxwell and some of the sales staff reporting to him found writing new business to Woodforest, with its more exacting underwriting standards, too difficult. [13]   In truth, Maxwell's real objection was that he couldn't earn as much compensation booking business to Woodforest as he had under the GMA business unit's prior relationship with Priority.  Whatever the reason, as Maxwell wrote in April: "I need a new bank that no one else is at." "But it would have to be a big enough bank that it wouldn't freak them out. This all went down in the last 2 months. ***Haven't approached any banks***." "[Woodforest is] fine for Paysafe [Irvine], GMA needs a new bank." Thus, from February 2018 to late May 2018, because of Maxwell's purposeful inaction, the GMA business unit lay fallow, and wrote essentially no new business. Moreover, even if Maxwell were to seek and find a new unicorn bank in this altered environment now wary of nutraceutical payment processors, Maxwell admitted it would take more than a year even to begin to recover.

Not surprisingly, given the foregoing, the GMA business unit's financials plummeted to a net negative EBITDA in May 2018. Things were so bad, Maxwell requested the staff to falsify its reporting to GMA LLC, which they refused to do. [14]   Simply put, by late May 2018 – and indeed for several months before that – the GMA business unit was in no longer operating in the ordinary course of business consistent with its past practice.

**At the End of May 2018, Maxwell Agreed to Combine the GMA Business Unit Staff**

**with the Paysafe Irvine Staff**

During the months leading up to the end of May 2018, Maxwell and GMA LLC discussed

---

[13]   This objection ignored the fact that, in the wake of the Mastercard audit, the underwriting requirements and regulatory scrutiny of all banks  -- not just Woodforest – had tightened considerably for high risk payment processing.

[14]   As Maxwell wrote in May 2018 to the head of sales: "Got off the phone with corporate. They want a sales forecast for GMA through the end of the year by end of today. I know you stand by these numbers you [Trey Smith] and Deon [McKinney] presented, but based on just this month we're way behind with 8 approvals. Do you want to revise these numbers because right now it would make us look like we're not meeting our forecast?"

1  combining the GMA business unit with Paysafe Irvine (with whom the GMA business unit shared

2  office space in Paysafe Irvine's Irvine, California location), such that GMA sales staff would move

3  to desks literally down the hall from their prior workstations and work side by side with Paysafe

4  Irvine employees to learn how to write business to Woodforest – the GMA business unit's only

5  remaining available option. Though Maxwell initially offered some objection, a meeting was held

6  on May 29, 2018 at which Maxwell and other meeting participants agreed that the GMA business

7  unit would be combined with Paysafe Irvine. As stated in a June 3, 2018 memo shared with

8  Maxwell memorializing the May 29, 2018 meeting: "The GMA [business unit] sales team will be

9  combined with the Paysafe 'Horsemen' [referring to sister company Paysafe Irvine's sales team]

10  and ideally be managed and overseen by yourself [Maxwell]."

11        Maxwell now claims that he did not agree with this combination plan, but Maxwell does not

12  and cannot dispute that at no time prior to the plan's implementation did Maxwell ever assert that

13  such a combination would constitute a "breach" of the ICA.  If Maxwell truly believed he had

14  complete control over the GMA business unit, as he now claims, he would have asserted that the

15  combination would constitute a breach of the ICA before the plan was implemented in an effort to

16  stop it.  He did not.  In fact, after a full discussion at which competing considerations were

17  discussed, all parties agreed to work together to move forward with the combination, with no claim

18  of "breach" by Maxwell. For the next three weeks, Maxwell participated in, and actively promoted,

19  the combination. [15]

20        Maxwell's consent to the combination therefore cannot be reasonably disputed. Indeed,

21  Maxwell has explained that the reason he went along with the combination was that Maxwell hoped

22  for a new compensation package to replace the compensation structure under the ICA which was

23  tied to the GMA business unit's plummeting EBITDA. In effect, Maxwell admits that he went along

24

25  [15]   Maxwell's early June 2018 writings include repeat statements that he was on the "same page" as
others; that "I think it will be pretty straightforward highlighting the value proposition and benefits
26  [of the combination]"; concerning implementation of the plan that it "sounds good and I totally agree
we should get that completed"; and that the plan outline is "very helpful from a high-level
27  perspective." As a GMA business unit salesperson testified, "Marc Maxwell never spoke ill of the
merger. He said 'We're going to go over and we're going to kick ass and we're going to do what we
28  do'."

*ACTIVE 66528800v1*

with the combination because he hoped for a better compensation deal in the form of a new employment agreement within the larger Paysafe Group.  For weeks after that May 29, 2018 meeting (and until Maxwell received a draft of a new employment agreement), Maxwell actively participated in the  combination plan without complaint and for weeks continued to receive and accept hundreds of thousands of dollars in compensation under the ICA. [16]

Further, even if Maxwell did not actually agree to the combination, but led others to believe that he agreed, Maxwell would be estopped to later claim "breach" through such actions. *See* Cal. Evid. Code § 623 ("Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."). [17]  Moreover, given the above facts, as well as the fact that Maxwell continued to accept payment under the ICA for several weeks after the combination plan was implemented, Maxwell waived any breach of contract claim.

### Apart from Maxwell's Consent, GMA LLC Had Authority to Act to Protect Its GMA Business Unit Asset

Even if Maxwell did not go along with the plan – though he plainly did – GMA LLC retained the ability to control and protect its asset and investment in many ways, including by simply not budgeting for its continued operation as a means to stop its losses. Rather than shut down the GMA business unit entirely or sell it (either of which would have netted Maxwell nothing), the parties chose a different, less drastic route as discussed above.

In late May 2018, the GMA business unit was operating well outside its "ordinary course of business consistent with past practice," such that GMA LLC (which wholly owned the GMA business unit) could act unilaterally to protect its asset as necessary. As noted, among other things,

---

[16]   That Maxwell continued to be paid under the ICA's formula itself refutes his claims that the ICA was "torn up" or that the GMA business unit was "folded" during this period of time.

[17]   Despite the clear fact that the combination did not constitute a breach of the ICA, GMA LLC's prompt cure following Maxwell's "after the fact" allegation of breach clearly demonstrates that had Maxwell made his breach contention known before the combination plan was implemented, the combination would not have occurred.

the GMA business unit had not only lost 80% of its prior merchant business (with the remaining 20% continuing to diminish), but had lost the ability to book any new business with Priority, which was the only way the GMA business unit had ever done business. Moreover, as Maxwell himself must concede, more than four months after losing the Priority relationship, the GMA business unit had no prospects for a new sponsor bank to replace the one provided through the Priority relationship. Accordingly, even if Maxwell had not gone along with the combination plan, the ICA gave the sole owner of the GMA business unit – GMA LLC – the power to act to salvage the GMA business unit as necessary. [18]

### The Combination Plan Was Working

As brief though as it may have lasted, the consolidation plan was working. As a result of the combined efforts to train GMA sales staff to write new merchant applications to Woodforest, the GMA business unit's applications skyrocketed when compared to the previous four months following the Mastercard audit. Thus, contrary to Maxwell's erroneous assertions, the actions taken by GMA LLC increased the GMA business unit's revenue and decreased its expenses, actions plainly permitted by the ICA.

### Maxwell Declares "Breach" When, Weeks After His Participation in the Combination, Maxwell Did Not Get a New Proposed Employment Agreement that Would Compensate Him at Pre-Audit Levels

At the May 29, 2018 meeting, given that the GMA business unit's EBITDA had plummeted, and with it Maxwell's potential earnings under the ICA, Maxwell had asked for a new employment agreement within the larger Paysafe Group. Though under no contractual obligation to do so, three weeks later (on June 21, 2018) Maxwell was provided a draft of a new employment agreement that would, if agreed to, replace the existing ICA. However, one day later, on June 22, 2018 – apparently dissatisfied as the new agreement would not provide compensation levels commensurate

---

[18]  As Maxwell himself testified, even if Maxwell were to have found a new sponsor bank, it would have taken more than a year for the GMA business unit even to *begin* to recover. The fact is, GMA LLC could not have survived in its current financial condition for another year. Therefore, according to Maxwell's interpretation of the ICA, GMA LLC had no choice but to continue suffering calamitous losses into the indefinite future, and/or watch it finally collapse.

with GMA's prior boom years[19]  – Maxwell declared that GMA LLC had somehow "breached" the ICA by offering a draft employment agreement not to Maxwell's liking and by proposing the consolidation plan in which Maxwell himself had actively participated for weeks.

**Without Conceding Breach, GMA LLC Cured any "Breach", and Maxwell**

**Subsequently Breached by Refusing to Participate in Any Way in the Cure Process**

On July 11, 2018 – well within the 30-day cure period provided by the ICA – GMA LLC responded to Maxwell's belated and unfounded claim of breach as follows:

"Paysafe [GMA LLC] absolutely denies it is in breach. Nonetheless, to avoid a time- and money-wasting dispute, Paysafe will "cure" (Agreement, Section 3.e.) the alleged breaches you set forth in your June 22 letter, and will do so effective no later than July 21, 2018. Specifically:

1.      GMA shall remain a separate business unit and shall not be combined with Paysafe.

2.      The organizational and reporting structures for Mr. Maxwell in his role as President of IPA shall not change as otherwise contemplated recently.

3.      Paysafe's offer of employment to Mr. Maxwell is hereby revoked and withdrawn.

4.      IPA shall continue to manage and have complete control over the operation of GMA, as set forth more specifically in the Independent Contractor Agreement. This includes, but is not limited to, the separate underwriting function performed by GMA, the prior budgeting process for the operation of GMA between IPA and Paysafe, and IPA's management of vendor relationships.

5.      Any employees subject to reassignment shall remain or be transferred back to GMA and GMA payroll. IPA shall determine such employees' compensation. The Los Angeles office will be re-opened.

If you contend that this "cure" is in any way inadequate, and that Paysafe has not completely

---

[19]   Maxwell's  expectation to receive compensation equal to what he received in prior years makes no sense, given the new financial reality of the GMA business unit.  Notably, given that the GMA business unit anticipated significantly reduced EBITDA levels for the foreseeable future, the draft employment agreement – which included salary and bonus amounts commensurate with what senior executives of the larger Paysafe Group earned, and even provided stock participation to which Maxwell would not otherwise have been eligible – would have provided higher compensation levels than Maxwell would have earned under the existing ICA. Moreover, if Maxwell was not satisfied with the draft agreement, he could have countered it, but never did.

1  cured any alleged breach, please let me know immediately so that Paysafe can consider whether any

2  additional "cure" is needed."

3          But of course neither Maxwell nor his counsel did let GMA LLC, or anyone else, "know

4  immediately."  In fact, neither ever substantively responded at all.  Following its initial July 11 cure

5  letter, Paysafe Group repeatedly wrote to Maxwell – both directly and through his counsel –

6  inquiring as to whether Maxwell believed the proposed cure was in any way deficient and requested

7  any additional measures Maxwell believed were needed to properly effectuate the cure. Throughout,

8  Maxwell and his counsel refused to respond with any substantive feedback. In failing to respond,

9  Maxwell breached the ICA's covenant of good faith and fair dealing.[20]

10          In fact, just days after Maxwell's counsel's June 22, 2018 breach letter, Maxwell had

11  departed for Europe for a lengthy holiday to follow The Rolling Stones tour, never having any

12  intention of continuing to honor his obligations under the ICA, irrespective of whatever cure efforts

13  GMA LLC might undertake.  Having received no response from Maxwell or his counsel, GMA

14  LLC timely implemented the cure steps described in its counsel's July 11, 2018 letter.

15          **After the Cure, Maxwell Further Breached the ICA by Refusing to Return to Work**

16          Despite Maxwell's refusal to even acknowledge GMA LLC's cure right, let alone participate

17  in the process, GMA LLC timely effectuated each of the cure steps enumerated in the July 11 cure

18  letter.  Further, prior thereto, in the week before the end of the 30-day cure period as set forth in the

19  ICA, GMA LLC wrote to Maxwell (and his lawyers) and instructed Maxwell to return to work on

20  Monday, July 23, 2018 to resume management of the GMA business unit, exactly as Maxwell had

21  requested.  Maxwell of course failed to show up, leaving the GMA business unit without a manager.

22  Maxwell thereby further breached the ICA.

23

---

24  [20]  "In essence, the covenant is implied as a supplement to the express contractual covenants, to
    prevent a contracting party from engaging in conduct which (while not technically transgressing the
25  express covenants) frustrates the other party's rights to the benefits of the contract." *Racine &
    Laramie, Ltd. v. Dept. of Parks & Rec.* (1992) 11 Cal.App.4th 1026, 1031-32. Indeed, the covenant
26  imposes an affirmative duty to act to protect the contracting parties' contractual rights: the "implied
    covenant imposes upon each party the obligation to do everything that the contract presupposes they
27  will do to accomplish its purpose." *Id.*  Here, those contractual rights under the ICA included GMA
    LLC's right to cure any alleged breach, and Maxwell thus had an obligation to engage with GMA
28  LLC in good faith in that process.

*ACTIVE 66528800v1*

In sum, GMA LLC did not breach the ICA when the parties combined the staffs of the two entities to work together to write business to Woodforest (the only option available to the GMA business unit), much less when it offered Maxwell (as he had repeatedly requested) a new employment agreement. In any event, GMA LLC cured any alleged "breach."[21]   For his part, Maxwell breached the ICA in multiple and separate ways when:

   • Maxwell failed to properly manage the GMA business unit following the Mastercard audit and up until the May 29, 2018 meeting;

   • After erroneously declaring "breach" by GMA LLC on June 22, 2018, Maxwell refused to engage in the cure process expressly set forth in the ICA; and

   • Maxwell failed to return to work at the end of the cure period or thereafter.

Further, having failed to perform his obligations under the ICA, Maxwell is barred from recovering on the ICA that he himself breached multiple times. *Fairchild v. Park*, (2001) 90 Cal. App. 4th 919, 934 ("Under standard contract law principles, a party who has breached a contract without justification or excuse may not enforce the contract."); *Meridian Financial Services, Inc. v. Phan*, (2021) 67 Cal. App. 5th 657, 685 (the doctrine of unclean hand "demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim.").[22]   The parties' respective positions on these claims of breach are the central issues before the jury.

**For the Court: The Liquidated Damage Provision of the ICA is an Unenforceable Penalty**

Wholly apart from the facts that (i) GMA LLC did not breach the ICA, (ii) even if it did,

---

[21]   Curiously, Maxwell claims that if one party claims that a supposed breach destroys "trust" between the parties, the breach is incurable. Legally, not only would this supposed "standard" be entirely unworkable, no law he cites supports this contention. Indeed, were Maxwell's contention correct, any party could side-step contractual cure provisions by claiming lack of trust. Factually, Maxwell's claim that the May 29, 2018 meeting breached his "trust" is further undermined by his many requests, after that supposed breach of "trust," for a new employment agreement. If Maxwell's trust was truly gone, why would he request a new employment agreement?

[22]   Maxwell also claims that he is entitled to deferred payments under the ICA for work performed in a prior year, which he claims totals approximately $4 million. However, and again, having failed to fulfill his obligations under the ICA, and having breached the ICA, he cannot now recover on it.

1   GMA LLC timely cured any breach, and, in fact, (iii) it was Maxwell that breached the ICA such

2   that he cannot recover on it, even if Maxwell could somehow overcome each of these three hurdles,

3   the "liquidated damages" provision set forth in the ICA is an unenforceable penalty under California

4   law.

5           The liquidated damages provision in the ICA provides, in relevant part, that for any breach

6   of the ICA:

7           "then in addition to the payment of any amounts earned by Independent Contractor through
            the effective date of termination, the Company [GMA LLC] shall pay to the Independent
8           Contractor . . . an amount equal to two (2) times the sum of the amount of the annual
            retainer, the amount of each of the last four (4) quarterly bonus payments, and the amount of
9           the last annual bonus in addition to any amounts already earned.[23]

10          Under California Code of Civil Procedure section 1671(b), a liquidated-damages clause is

11  unenforceable if it was "unreasonable under the circumstances existing at the time the contract was

12  made."  California courts have long held that such a clause is unreasonable if it is not "the result of a

13  reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be

14  sustained."  *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1998).  GMA LLC will

15  show that under Ridgley and other cases reflecting longstanding California law on this issue, the

16  liquidated-damages provision in the ICA is an invalid and unenforceable penalty.

17          Whether a liquidated-damages clause is enforceable or an invalid penalty is a question for

18  the court, not the jury.  *E.g., Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1314

19  (2005); *Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1383, 1393 (1991).  For that reason, the

20  Court should bifurcate the trial. In one phase, the Court would decide whether the liquidated-

21  damages clause is enforceable; in the other phase the jury would decide whether either party

22  breached the contract. The order of these phases also needs to be determined.

23          In sum:

24          (1)      GMA LLC did not breach the ICA, but even if it did, GMA LLC timely cured in any

25

26  [23]    The manner in which liquidated damages are to be calculated under the ICA demonstrates
    Maxwell's urgent desire to manufacture a "breach" by GMA LLC.  Because the liquidated damages
27  amount is directly tied to the ***past*** financial success of the GMA business unit, and given the GMA
    business unit's rapid and calamitous financial decline following the Mastercard audit, the longer
28  Maxwell waited to declare a "breach", the smaller his liquidated damages amount would become.

                                         25
                                  PRETRIAL ORDER

event.

(2)   Maxwell is estopped from claiming breach as he willingly participated in the process to combine the GMA LLC and Paysafe Irvine sales staffs and never declared such a combination to be a breach of the ICA until after it occurred.

(3)   Maxwell breached the covenant of good faith and fair dealing (including in his refusal to engage in the cure process) and engaged in unclean hands throughout. Maxwell further breached the ICA when he failed to return to work on July 23, 2018. As such, Maxwell cannot recover for "breach" under the ICA in any event, much less based on its invalid liquidated damages provision.

(4)   The liquidated damages provision set forth in the ICA is an unenforceable penalty under California law.

## II.   STATEMENT OF JURISDICTION

### A.   IPA/Maxwell's Statement of Jurisdiction

This Court also has original subject matter jurisdiction over the claims asserted herein (all of which are state law claims) under 28 U.S.C. § 1332 because there is a complete diversity of citizenship between International Payment Services, LLC and Marc Maxwell, on the one hand, and Paysafe US, on the other hand, and the amount in controversy exceeds $75,000.

### B.   GMA LLC's Statement of Jurisdiction

This Court has diversity jurisdiction under 28 U.S.C. § 1332 on the basis that IPA and Maxwell are citizens of the state of Nevada, and GMA LLC is not, and that the amount in controversy exceeds $75,000.

## III.   STATEMENT OF ALL UNCONTESTED FACTS DEEMED MATERIAL IN THE ACTION

None.

## IV.   STATEMENT OF CONTESTED ISSUES OF FACT

These contested facts are conditional. Any agreement to introduction of evidence relating to these factual assertions depends on, among other things, evidentiary rulings by the Court, including on motions in limine, and the purpose for which a fact is sought to be established. Further, the

26
PRETRIAL ORDER

appropriate granularity with which factual designations are to be stated is uncertain. Accordingly, the parties reserve all rights to introduce other facts at trial, and agree that inclusion or omission of any facts from the following list will not effect a waiver of rights or otherwise prejudice either party.

**A.**   **IPA/Maxwell's Contested Facts**

1.     Whether Paysafe US breached the ICA's "complete control" provision set forth in Section 1.a.

2.     Whether Paysafe US breached the ICA's covenant in Section 1.b. that Paysafe US will not take any action that would interfere with the IPA's management and operation of the GMA business unit in the ordinary course of business consistent with past practice.

3.     Whether Paysafe US breached the ICA's covenant in Section 1.b. that Paysafe US will not take any action with respect to the operation of the GMA business unit that could reasonably be expected to have the effect of decreasing the gross revenue or increasing the expenses of the GMA business unit.

4.     Whether Paysafe US breached the implied covenant of good faith and fair dealing.

5.     Whether, without IPA's prior written consent, Paysafe US materially breached any provision of the ICA.

6.     Whether, without IPA's prior written consent, Paysafe US caused a material adverse change in IPA's duties and authorities.

7.     Whether, without IPA's prior written consent, Paysafe US caused a reduction in any element of IPA's Consulting Fee.

8.     The amounts of each quarterly bonus used in the ICA's liquidated damages formula.

9.     The amount of the annual bonus used in the ICA's liquidated damages formula.

10.    The total amount owed IPA under the ICA's liquidated damages provision.

11.    The amounts earned by and owed to IPA under the ICA as of the termination date of the ICA.

12.    If the ICA's liquidated damages clause is deemed invalid and Paysafe is found to have breached the ICA, IPA's actual lost profits caused by Paysafe US's breaches of the ICA, or Paysafe US's own profits generated as a result of any breach of the ICA by Paysafe US.

13. The types of fiduciary duties, if any, owed by Maxwell or IPA to Paysafe US.

14. Whether Maxwell and IPA owed Paysafe US a fiduciary duty regarding IPA's assertion of breaches by Paysafe US under the ICA.

15. Whether IPA or Maxwell had a personal financial arrangement with Priority.

16. Whether IPA or Maxwell refrained from securing other banks in order to advance his own personal financial interests.

17. Whether IPA or Maxwell refrained from accepting Paysafe US's invitation to bank with Woodforest in order to advance his own personal financial interests.

18. Whether Maxwell or IPA "manufactured" alleged breaches of the ICA.

19. Whether Maxwell or IPA's alleged "manufacturing" of alleged breaches of the ICA breaches any fiduciary duty either party owed to Paysafe.

20. Whether Paysafe US has suffered any damages arising from Maxwell or IPA's alleged breaches of fiduciary duty.

21. Whether Paysafe US performed all of its unexcused obligations under the ICA, including whether Paysafe US provided timely written notice of any alleged prior breaches of the ICA by IPA or Maxwell

22. Whether IPA failed to do something expressly required under the IPA or was excused from having to do those things.

23. Whether IPA engaged in conduct that prevented Paysafe US from receiving the benefits of the ICA.

24. Whether by doing so, IPA acted in bad faith, thus breaching the implied covenant of good faith and fair dealing.

25. Whether Paysafe US was harmed by an IPA breach of an express term of the ICA or the ICA's implied covenant of good faith and fair dealing.

26. Whether IPA used its market power in a relevant market to coerce Paysafe US into agreeing to the liquidated damages clause in the ICA.

27. The opportunity cost incurred by IPA in entering into the ICA.

28. Whether the ICA's liquidated damages clause is of a type customary in the industry

2164397
ACTIVE 66528800v1

1   or generally.

2        29.    Whether Paysafe US's claims and defenses are barred by the doctrine of unclean

3   hands.

4        30.    Whether Paysafe US's claims and defense are barred by the doctrine of waiver

5        31.    Whether Paysafe US's claims and defenses are barred by the doctrine of estoppel

6        32.    Whether Paysafe US's claims and defenses are barred by the doctrine of laches

7        33.    Whether any remaining affirmative defenses asserted by Paysafe US (to the extent

8   not waived by Paysafe US or dismissed by the Court at or before trial) have merit.

9        34.    Whether the GMA business unit's primary market segment was the "high risk" or

10  "continuity" segment of the payment processing industry constituted by online merchants who sell

11  their products and services based upon an initial trial offer followed by automatic monthly billing

12  known as continuity merchants.

13       35.    Whether the predominant product merchants serviced by the GMA business unit

14  were in the nutraceutical business.

15       36.    Whether GMA operated as a sub-ISO to an ISO known as Priority Payments Systems

16  ("Priority").

17       37.    Whether in 2014, the GMA business unit generated EBITDA in excess of $7.8M.

18       38.    Whether in 2015, the GMA business unit generated EBITDA in excess of $9.6M.

19       39.    Whether in 2016, the GMA business unit generated EBITDA in excess of $14M.

20       40.    Whether in 2017, the GMA business unit generated EBITDA in excess of $19M.

21       41.    Whether in the first half of 2018, the GMA business unit generated profits in excess

22  of $5M.

23       42.    Whether in July 2017, IPA and Paysafe US executed the ICA.

24       43.    Whether Paysafe US Chief Operating Officer Danny Chazonoff initiated the

25  negotiation of the ICA with Marc Maxwell to preserve the continuing revenue stream from GMA to

26  Paysafe US and to avoid Maxwell setting up a competing operation.

27       44.    Whether the parties to the ICA were sophisticated parties.

28       45.    Whether the parties to the ICA were represented by counsel and had equal bargaining

2164397

*ACTIVE 66528800v1*

1  power.

2      46.    Whether the negotiation of the ICA involved Marc Maxwell, his attorney Jordan
3  Hamburger, and Paysafe executives Danny Chazonoff, Chad Anselmo, Elliot Wiseman, and Nick
4  Walker.

5      47.    Whether the ICA had an indefinite term.

6      48.    Whether the parties to the ICA expressly agreed in ICA Section 3.c. that the ICA's
7  liquidated damages payout was "not a penalty, but instead a reasonable measure of damages, based
8  upon the parties' experience and given the nature of the losses that may result therefrom."

9      49.    Whether the ICA addressed in part the terms for IPA's management of the Paysafe
10  US business unit known as GMA.

11      50.    Whether the parties' lead negotiators of the ICA both understood that conduct
12  outside the "ordinary course of business" as used in Section 1b  meant fraud or ultra vires conduct.

13      51.    Whether IPA entered into the ICA with Paysafe based, in part, on Marc Maxwell's
14  belief that the liquidated damages clause was enforceable and would protect IPA from potential
15  breaches by Paysafe US.

16      52.    Whether Paysafe US recognized that, prior to agreeing to the ICA, Marc Maxwell
17  had an opportunity to make significant income elsewhere and was induced by the ICA to forego that
18  opportunity.

19      53.    Whether a chargeback refers to a situation where the consumer in a credit card
20  transaction is dissatisfied  in a transaction with a merchant and challenges the charge made in the
21  transaction.

22      54.    Whether the credit card brands have established chargeback thresholds whereby
23  merchant accounts will be automatically closed if their chargebacks exceed a designated threshold
24  per month.

25      55.    Whether high risk, continuity merchant accounts carry an inherent higher risk of
26  being closed due to violation of chargeback thresholds.

27      56.    Whether the higher risk of closure of  continuity merchant accounts due to violation
28  of chargeback thresholds and actions to reduce this risk are part of the ordinary course of business of

2164397

ACTIVE 66528800v1

high risk payment processing.

57.     Whether revenue volatility is a common occurrence and known risk in the high risk payment processing industry.

58.     Whether audits by credit card companies were a known risk and common occurrence in the high risk payment processing industry at the time when the parties executed the ICA in July 2017.

59.     Whether Mastercard routinely conducted an annual industry audit of high risk continuity merchant accounts boarded with acquirer banks registered with Mastercard.

60.     Whether in the fall of 2017, Mastercard began an industry-wide audit of banks and Independent Sales Organizations ("ISO") carrying high risk, continuity merchant accounts.

61.     Whether during the MasterCard audit, IPA through Marc Maxwell and the GMA underwriting and risk staff communicated with Priority to seek reasons for and challenge MasterCard's decisions to close GMA merchant accounts.

62.     Whether a key concern and basis for closing of merchant accounts by Mastercard during its audit was load balancing.

63.     Whether load balancing refers to high risk merchants spreading their payment processing across multiple affiliate accounts to avoid closure based upon violation of chargeback thresholds.

64.     Whether during the MasterCard audit, Maxwell worked with Paysafe to develop and investigate purchasing a software solution from Triangle Media that would make any load balancing by merchants transparent to credit card brands and acquirer banks.

65.     Whether on March 8, 2018, Paysafe and Triangle Media executed a Letter of Intent for potential purchase of software for a CRM/gateway to make any load balancing by merchants transparent to credit card brands and acquirer banks.

66.     Whether Mastercard advised Paysafe US in May 2018 that it viewed CRM software solution from Triangle Media proposed by Maxwell as a "workable option" for addressing the load balancing issue.

67.     Whether Maxwell continued to work with Paysafe US to develop and refine the

31

2164397

*ACTIVE 66528800v1*

software offered by Triangle Media as a solution to the load balancing issue until June 13,2018 when Paysafe US made the decision not to proceed with this option.

68.     Whether Paysafe US recognized that the Mastercard audit would impact GMA and Paysafe US differently, due to their different business models.

69.     Whether Paysafe US executives have recognized that it was difficult to get new acquirer bank relationships for high risk merchant accounts following the Mastercard audit, because, among other things, there was a limited population of banks that participated in the high risk sector and that population had been reduced due to the Mastercard audit.

70.     Whether both GMA and the Paysafe US business unit operating in Irvine, California ("Paysafe Irvine") had "high risk" accounts, but Paysafe Irvine also had low-risk business within its portfolio.

71.     Whether while Paysafe Irvine had access to data from Woodforest Bank that allowed Paysafe Irvine to look behind credit card transactions in order to challenge account closures by Mastercard during its audit,, GMA did not have access to similar data from Priority .

72.     Whether unlike Paysafe Irvine, GMA (as a sub-ISO to Priority ) did not have the ability to communicate directly with Mastercard to challenge account disclosures during the Mastercard audit

73.     Whether at the time of the Mastercard audit, there was an overlap between high risk merchants in the merchant portfolios of Paysafe Irvine and GMA.

74.     Whether Paysafe US was concerned, during the Mastercard audit, that Mastercard would perceive there to be load balancing within Paysafe based on the overlap between GMA and Paysafe Irvine accounts.

75.     Whether Paysafe US was also concerned during the Mastercard audit that Woodforest Bank might perceive there to be load balancing within Paysafe based on the overlap between GMA and Paysafe Irvine accounts.

76.     Whether Paysafe US was also concerned during the Mastercard audit that if Woodforest bank learned that GMA and Paysafe had overlapping high risk merchant accounts, it would damage Paysafe US's relationship with Woodforest Bank.

2164397
*ACTIVE 66528800v1*

77.     Whether to address the concern that Mastercard might perceive there to be load balancing within Paysafe US based on the overlap between GMA and Paysafe Irvine merchant accounts, Paysafe US executive Sean Lavelle stated  that it was "probably best if GMA is not visible" during the in person audit of Paysafe Irvine accounts by Mastercard in February 2018.

78.     Whether Paysafe US's Head of Risk Shaun Lavelle consistently recommended to Paysafe US senior management including Chazonoff from November 2017 through May 2018 that GMA should be amalgamated into Paysafe Irvine in order to avoid any overlap in merchant accounts and ensure that Paysafe US risk policies and procedures applied to all Paysafe high risk merchant accounts.

79.     Whether GMA's Los Angeles office was closed in February 2018 by Paysafe US in order to achieve costs savings.

80.     Whether the closure of the Los Angeles office of GMA required the GMA sales team which had worked in the office to work remotely from home.

81.     Whether in early May 2018, Paysafe senior management including Chazonoff and Ben Dalfen were engaged in meetings in Houston aimed at developing a plan to amalgamate GMA into Paysafe Irvine.

82.     Whether on May 9,  2018, Ben Dalfen sent an email to Chazonoff and other Paysafe US management memorializing the plan agreed to at the Houston meetings to reduce the GMA staff from 11 to 6 and amalgamate GMA into Paysafe Irvine.   (the "Dalfen May 9 Email")

83.     Whether the Dalfen May 9 email set forth the reasons for the GMA amalgamation into Paysafe Irvine as being Maxwell's "rock solid exorbitant consulting agreement", the desire to reduce dependency on the Paysafe Irvine sales team, "use Marc and his team to increase the Irvine portfolio at Woodforest (Bank)" and avoid new competition from Maxwell and the GMA sales team.

84.     Whether in May of 2018, Paysafe US management provided a written report to  its Board of Directors entitled "Board Report—Mastercard Challenges" which, among other matters, explained that the amalgamation of GMA into Paysafe Irvine was based upon the recommendation of Paysafe's SVP Risk because it eliminated any overlap of merchant accounts and it would "look

33

PRETRIAL ORDER

better if Mastercard reviewed Paysafe holistically"'.

85.     Whether in May 2018, Paysafe US implemented an initiative known as "Double Down on Nutra" designed to increase EBITDA from high risk merchant payment processing in order to take advantage of the significant elimination of competitors in this sector due to the Mastercard audit.

86.     Whether the "Double Down on Nutra" initiative had a time frame of two (2) years through 2020 and focused on improving the performance of Paysafe Irvine, including increasing its sales team.

87.     Whether by no later than early June 2018, the GMA business unit was amalgamated with Paysafe Irvine, and ceased to exist as a separate business unit.

88.     Whether prior to being amalgamated with Paysafe Irvine, the GMA business unit had its own merchant portfolio and merchant data.

89.     Whether prior to being  amalgamated with Paysafe Irvine, the GMA business unit had its own sales team separate from Paysafe US.

90.     Whether prior to being  amalgamated with Paysafe Irvine, the GMA business unit had its own risk and underwriting team separate from Paysafe US.

91.     Whether prior to being amalgamated with Paysafe Irvine, the GMA business unit's risk and underwriting team operated under and followed its own written underwriting and risk policies that were separate from Paysafe US.

92.     Whether prior to being amalgamated with Paysafe Irvine, the GMA business unit did not report to Paysafe's Global Credit Risk Management Committee.

93.     Whether prior to being amalgamated with Paysafe Irvine, the GMA business unit operated independently from the Payment Processing division at Paysafe US.

94.     Whether as part of the rolling of GMA into Paysafe Irvine, Paysafe US changed the organizational and reporting structures for Marc Maxwell from those required under the ICA.

95.     Whether as part of the rolling of GMA into Paysafe Irvine, IPA no longer managed and had complete control over the operation of GMA, as set forth  in the ICA.

96.     Whether as part of the rolling of GMA into Paysafe Irvine,  GMA risk and

2164397

*ACTIVE 66528800v1*

1   underwriting staff  were reassigned to the Paysafe US payroll.

2       97.     Whether as part of the rolling of GMA into Paysafe Irvine,  GMA risk and

3   underwriting staff  were reassigned to Paysafe Irvine departments.

4       98.     Whether as part of the rolling of GMA into Paysafe Irvine,  GMA risk and

5   underwriting staff were reassigned to Paysafe Irvine supervisors.

6       99.     Whether as part of the rolling of GMA into Paysafe Irvine,  GMA risk and

7   underwriting staff were physically relocated from a GMA-only room to areas where Paysafe Irvine

8   staff were located.

9       100.    Whether as part of the rolling of GMA into Paysafe Irvine, GMA staff  had reporting

10  relationships changed .

11      101.    Whether as part of the rolling of GMA into Paysafe Irvine, GMA staff were required

12  to use Paysafe Irvine's risk and underwriting policies .

13      102.    Whether as part of the rolling of GMA into Paysafe Irvine, GMA staff  were

14  performing work for the Paysafe Irvine portfolio .

15      103.    Whether prior to June 22, 2018, Marc Maxwell objected to Paysafe US's decision to

16  amalgamate GMA into Paysafe Irvine.

17      104.    Whether IPA (through Maxwell) confirmed in writing on June 19, 2018 that it

18  objected to Paysafe US's amalgamation of the GMA business unit into Paysafe Irvine.

19      105.    Whether on June 21, 2018, Paysafe US sent Marc Maxwell an "Employment

20  Agreement" stating that Maxwell was an employee reporting to Paysafe US executives and

21  replacing the compensation arrangements set forth in the ICA.

22      106.    Whether on June 22, 2018, David Moran, on behalf of IPA, sent a letter to Danny

23  Chazonoff stating that ICA was terminating the ICA with Good Reason and requesting payment of

24  amounts earned and owed under the ICA and liquidated damages owed under the ICA.

25      107.    Whether pursuant to the terms of the ICA, IPA's June 22, 2018 notice of termination

26  of the ICA became effective five (5) days later on June 27, 2018.

27      108.    Whether prior to June 22, 2018 (the date when IPA sent its notice of termination

28  letter), Paysafe US did not give IPA or Maxwell notice of any  breach of the ICA by IPA or

2164397
ACTIVE 66528800v1

1  Maxwell.

2       109.    Whether prior to June 22, 2018 (the date when IPA sent its notice of termination

3  letter), Paysafe US did not give IPA or Maxwell notice that IPA was purportedly managing and

4  operating the GMA business unit outside the ordinary course of business consistent with past

5  practice.

6       110.    Whether prior to June 22, 2018 (the date when IPA sent its notice of termination

7  letter), Paysafe US did not give IPA or Maxwell notice that Paysafe US was purportedly entitled

8  under the ICA to amalgamate the GMA business unit into Paysafe Irvine.

9       111.    Whether pursuant to the terms of the ICA, any amounts for annual or quarterly

10  bonuses earned and owed to IPA were payable within ten days after the effective termination date of

11  the ICA.

12       112.    Whether under Paysafe US's contention that the effective termination date of the

13  ICA was in July 2018, the May 2018, June 2018, and July 2018 retainer payments (each in the

14  amount of $16,666.67) were amounts earned by IPA prior to termination of the ICA.

15       113.    Whether under the terms of the ICA, IPA earned a Q2 2018 quarterly bonus.

16       114.    Whether IPA's June 22, 2018 letter giving notice to Paysafe US of its termination of

17  the ICA with Good Reason calculated the total of the amount owed to IPA (including liquidated

18  damages) as $16,852,735.92 ,which included the amount of  $3,160,852.36 in annual bonus

19  installment payments IPA had already earned and was owed under the ICA as of that date.

20       115.    Whether IPA'S June 22, 2018 letter giving notice to Paysafe US of its termination of

21  the ICA with Good Reason stated, in part: "Recently, Paysafe materially breached its obligations

22  under the Agreement by depriving IPA of the ability and authority to 'manage, and have complete

23  control over the operation of,' GMA, and caused a material adverse change in IPA's duties and

24  authorities by stripping IPA of its 'management of the administrative, underwriting, and sales

25  functions of the GMA business unit.'…In fact, because the GMA business unit is being eliminated,

26  IPA no longer has any management or operations responsibilities with respect to GMA and GMA's

27  gross revenues will be eliminated entirely."

28       116.    Whether on July 11, 2018, Paysafe US through its counsel sent a letter to IPA's

counsel responding to IPA's June 22,2018 notice of termination letter.

117.    Whether in its July 11, 2018 letter to IPA, Paysafe US stated that it would cure any breaches of the ICA "by no later than July 21, 2018".

118.    Whether Paysafe US did not effect a cure of any breaches of the ICA by July 21, 2018.

119.    Whether as one of its purported cure steps, Paysafe US's July 11, 2018 letter offered to re-open the GMA Los Angeles office, but Paysafe US never re-opened the GMA Los Angeles office.

120.    Whether Paysafe US did not effect a cure of all breaches of the ICA by July 21, 2018.

121.    Whether Paysafe US took no action to try to effect any cure of its breaches of the ICA until July 23,2018.

122.    Whether GMA staff members, including Matylda Smolen expressed "utter confusion" on and after July 23,2018 regarding Paysafe US's July 23,2018 announcement of reconstituting GMA

123.    Whether Paysafe US never paid IPA or Maxwell any money as a purported cure of any breach of any ICA non-monetary covenant.

124.    Whether to date, Paysafe US has not paid IPA the balance of the 2016 and 2017 annual bonus installment payments IPA earned prior to termination of the ICA.

**B.    GMA LLC's Contested Facts**

1.    Defendant/counter-claimant Global Merchant Advisors LLC (GMA LLC) was formed in 2014 under the name "NetBx LLC". Its name was then changed to "Paysafe Services (US) LLC" and then in 2017 (prior to the signing of the "Independent Contractor Agreement" at issue in this lawsuits) changed its name to Global Merchant Advisors LLC. At all times since early 2017, and through the present, defendant has been named Global Merchant Advisors LLC (GMA LLC).

2.    At all times relevant to this dispute, GMA LLC was managed by its sole member, Paysafe Services (US) Corp.

2164397

ACTIVE 66528800v1

3.      GMA LLC's managing member was controlled by its President, Danny Chazonoff.

4.      Mr. Chazonoff was also the Chief Operating Officer of Paysafe Group, which ultimately owns GMA LLC and various non-party "Paysafe" entities.

5.      In 2014, Defendant/counter-claimant GMA LLC (then "NetBx LLC") purchased certain assets from a third-party called Global Merchant Advisors Inc. for $15 million, specifically, a business unit that sold credit card processing services mostly to retailers engaged in card not present sales to consumers.

6.      Such retailers typically sell these products based on an initial trial offer that continues monthly unless the customer cancels the service in a subsequent month.

7.      In the credit card processing industry, this line of business is often referred to as a "high risk" sector.

8.      The asset acquired by GMA LLC (then "NetBx LLC") in 2014 from Global Merchant Advisors Inc. was referred to as the "GMA business unit."

9.      The purchase by GMA LLC of the GMA business unit closed on August 15, 2014.

10.     Prior to the acquisition by GMA LLC of the GMA business unit in 2014, Maxwell was an employee-manager of the seller, Global Merchant Advisors, Inc., and was supervised by the owners of that corporation.

11.     After the acquisition of the GMA business unit by GMA LLC, Maxwell continued in his role as an employee-manager, though this time pursuant to a contract of employment with the acquirer, GMA LLC (then known as NetBx).

12.     Maxwell's employment contract with GMA LLC provided limits on Maxwell's authority and, throughout this period, Maxwell reported to Mr. Chazonoff.

13.     To engage in credit card processing, a sales organization like the GMA business unit must have access to a "sponsor bank" approved by the credit card brands (i.e. Mastercard, Visa, Discover, etc.).

14.     The sponsoring bank (and the payment processor) is subject to regulation and oversight from the card brands, like Mastercard and Visa.

15.     Typically, a sales entity contracts with a sponsor bank as an independent sales

organization, or "ISO." Sometimes, however, an entity with no direct relationship with a sponsor bank contracts with an ISO (an entity with a relationship to a sponsor bank) and is referred to as a sub-ISO.

16.    The selling entity receives a percentage (sometimes called a "split") of the revenue (sometimes called the "residual") created by a retailer's credit card processing activity for the retailer (as a result of consumer purchases). This spit is allocated between the sponsor bank and the ISO, or between the ISO and its sub-ISO.

17.    The GMA business unit that GMA LLC acquired, though a sale organization in this "high risk" space, did not have a direct relationship with a sponsoring bank. Rather, it contracted as a "sub-ISO" to ISO Priority Payment Systems LLC ("Priority").

18.    Priority in turn had a direct relationship with a sponsoring bank. Priority is a third party and not within Paysafe Group ownership.

19.    Thus, the GMA business unit was one step removed from the sponsoring bank, and Priority (not the GMA business unit), had the relationship to the acquiring bank.

20.    When the GMA business unit submitted merchant applications to Priority, the GMA business unit first underwrote the applications, which were then underwritten again by Priority.

21.    The GMA business unit had a very favorable split with Priority under which the GMA business unit received 93% of the revenue.

22.    That favorable split was key to the GMA business unit's financial success, key to its acquisition, and a central reason for entry into the Independent Contractor Agreement at issue in this dispute.

23.    At the same time the GMA business unit was purchased by GMA LLC, the ultimate parent company of GMA LLC, Paysafe Group, also acquired an entity based in Irvine, California which sells many of the same products and services as the GMA business unit.  That sister entity is generally known as Meritus or Paysafe Irvine. For simplicity, we will refer to this entity as "Paysafe/Irvine".

24.    Like GMA LLC and its newly acquired GMA business unit, Paysafe/Irvine sold payment processing services to high-risk retailers.

2164397
ACTIVE 66528800v1

25.     Unlike the GMA business unit, Paysafe/Irvine had a direct relationship with a sponsoring bank, called Woodforest Bank.

26.     However, unlike the GMA business unit, when Paysafe/Irvine underwrote applications to Woodforest, those applications were not subject to a second underwriting by a separate ISO.

27.     Though they had different ISO structures, GMA LLC and Paysafe/Irvine were, in effect, sister companies within a larger corporate tree, offering the same services to retailers in the same market space.

28.     However, Paysafe Irvine was much larger, both in terms of revenue and headcount, than GMA LLC and its GMA business unit.

29.     This chart accurately summarizes the foregoing:



30.     These two sister companies shared costs. Most of the GMA business unit's staff (paid for by the corporate parent) worked in Paysafe Irvine's office space on the same floor and behind the same entry doors as Paysafe Irvine employees. This included all of the GMA business unit's underwriting department and customer support staff, as well as its head of risk, Deon McKinney.

31.     The balance of the GMA business unit's staff originally worked from a location on

40

PRETRIAL ORDER

Olympic Boulevard in Los Angeles until late February 2018, when Maxwell/IPA decided the Olympic Boulevard location would be closed, and that the GMA business unit's sales team that had worked from that location would work remotely.

32.     Throughout, Maxwell often worked from his home in Las Vegas, though he was also provided by GMA LLC, at no cost to Maxwell or IPA, a home in Southern California. At times, Maxwell worked from both the Los Angeles and Irvine locations.

33.     Accounting, legal, HR, payroll, office space, professional tools and other needs for operation of GMA business unit's were paid for by its corporate owner.

34.     Between the end of 2014 and into 2016, the GMA business unit's financial performance was good under the Priority relationship and proved to be a lucrative investment for GMA LLC.

35.     In 2015 and 2016, Maxwell became dissatisfied with his compensation and sought a new arrangement.

36.     Though the new contract between Maxwell and GMA LLC would take more than a year to complete and execute, from the beginning of the negotiation Maxwell insisted that he no longer be an employee, and that an entity formed by Maxwell (plaintiff and counter-defendant International Payment Advisors ("IPA")) would contract with GMA LLC as an "independent contractor", and Maxwell would continue to provide management services of the GMA business unit to GMA LLC through IPA.

37.     At various times throughout the year during which the ICA was negotiated, and right up until it was signed, different compensation proposals were floated by the parties for this "independent contractor" arrangement such that Maxwell/IPA would receive various percentages of the GMA business unit's quarterly and yearly EBITDA.

38.     "EBITDA" stands for "Earnings Before Interest, Taxes, Depreciation, and Amortization" and is a measure of a company's overall financial performance.

39.     Toward the end of the negotiation, in July 2017, Maxwell took issue with the financial terms, claimed and represented that the parties had set his compensation structure "almost a year ago," and threatened to falsely claim "breach" of the parties' oral agreement by GMA LLC and file a lawsuit

on his false claims if his new draft proposal (changed from prior drafts) was not signed at once.

40.    In response, in July 2017 the parties (Maxwell through IPA and GMA LLC under a former name, "Paysafe Services (US) LLC") signed Maxwell's newest version of a contract (the ICA), including its "independent contractor" designation, and was stated to be retroactive to January 1, 2016.

41.    The change in structure created by the ICA was as follows:



42.    Maxwell was IPA's sole employee, sole member, sole owner and sole authorized signatory.

43.    IPA's office was in Maxwell's Las Vegas residence.

44.    IPA had no assets other than Maxwell.

45.    Maxwell alone determined when he would receive funds from IPA, and in what amounts.

46.    All of IPA's money ultimately went to Maxwell.

47.    All activities by Maxwell for the GMA business unit were funded by GMA LLC, with no contribution from IPA.

2164397
ACTIVE 66528800v1

48.     Maxwell also used IPA's bank account to pay for non-business expenses, such as cosmetic dentistry, mattresses, gifts and loans to family members, and other purposes not tied to IPA's legitimate business operations.

49.     Maxwell/IPA's claims that by signing the ICA, GMA LLC gave Maxwell/IPA "complete control over the operation of [the] GMA" busines unit that GMA LLC had acquired in 2014 and had run prior to execution of the ICA, including "complete control over GMA's operations, including management of the administrative … functions" of the unit, as well as all hiring/firing decisions and the "compensation payable to such staff."

50.     At no point did IPA or Maxwell have complete control over the GMA business unit's basic administrative, HR, legal or even payroll functions and decisions. All of this was paid for by its corporate owner.

51.     None of the individuals that worked for the GMA business unit was employed by Maxwell or IPA (with the exception of Maxwell after the ICA became effective, at which point Maxwell was IPA's only employee and then provided service for the GMA business unit through that contract).

52.     Maxwell/IPA did not have complete control over compensation or expenses for the staff of the GMA business unit, including Maxwell's own expenses which he was required to obtain approval for from the Paysafe Group.

53.     And far from being in complete control of the GMA business unit, Maxwell/IPA had no meaningful understanding of the structure of what he was managing, its ownership, or its relationship to affiliated entities.

54.     Maxwell/IPA did not have complete control over the strategic decisions for the GMA business unit.

55.     Maxwell/IPA did not have authority to contract to enter into an ISO relationship for the GMA business unit, which is the single most important relationship for the GMA business unit.

56.     Without an ISO relationship providing access to a sponsor bank, the GMA business unit could not operate.

57.     Maxwell/IPA did not have authority to sign a non-disclosure agreement that was

43

*ACTIVE 66528800v1*

1    being requested by a potential GMA business unit banking partner as a prerequisite to begin

2    discussions about a potential relationship.

3        58.    Members of the GMA business unit sales team knew that Maxwell reported to, and

4    was subordinate to, others within the Paysafe Group.

5        59.    The ICA between GMA LLC and IPA provided that Maxwell/IPA's level of control

6    over the GMA business unit was limited to what was "consistent with past practice."

7        60.    "Past practice" as used in that provision of the ICA is a reference to Maxwell's

8    authority prior to January 1, 2016, when Maxwell was an employee-manager governed by his GMA

9    LLC employment contract.

10       61.    As Maxwell testified in this regard: "Q. Is it your understanding that the reference to

11   'consistent with past practices -- consistent with past practice' is a referral to the period prior to

12   January 1, 2016, before the effective date of the independent contractor agreement? A: Yes. Q.

13   Okay.And what we're referring to there is the way that the GMA business unit was run prior to

14   January 1, 2016; correct? A: Correct."

15       62.    Under the ICA and its "consistent with past practice" limitation, Maxwell/IPA did

16   not handle "the financial aspect of the business, meaning bookkeeping, taxes, the balancing of book

17   … legal requirements" of the GMA business.

18       63.    Under the ICA and its "consistent with past practice" limitation, Maxwell/IPA could

19   not raise GMA business unit staff salary as Maxwell/IPA desired without permission from GMA

20   LLC, including Danny Chazonoff.

21       64.    Under the ICA and its "consistent with past practice" limitation, Maxwell/IPA's

22   expenses were reimbursable under the ICA only if consistent with past practice when Maxwell was

23   an employee.

24       65.    Under the ICA and its "consistent with past practice" limitation, Maxwell/IPA could

25   not enter into contracts on behalf of the GMA business unit.

26       66.    The ICA gave GMA LLC the ability to intervene in Maxwell/IPA's management of

27   the GMA business unit if the business unit was no longer operating "consistent with past practice."

28       67.    In the period after the January 1, 2016 effective date of the ICA, when something

2164397
ACTIVE 66528800v1

1  would fall outside Maxwell's pre-January 1, 2016 authority, it would be a matter for Mr. Chazonoff

2  to decide.

3      68.     Under the ICA, Maxwell/IPA was required to "mutually agree[] with the Company

4  [GMA LLC] on the budget for all aspects of the GMA business unit."

5      69.     Under the ICA, Maxwell/IPA had to submit a budget for the GMA business unit for

6  approval and was subject to audits by its corporate owner.

7      70.     The ICA requires that Maxwell/IPA's actions must be "consistent with the

8  Company's delegated authority matrix," which imposes limits on Maxwell/IPA's authority to

9  engage in certain transactions above certain dollar amounts.

10     71.     The ICA gave GMA LLC the ability to intervene in Maxwell/IPA's management of

11  the GMA business unit if the business unit was operating outside its "ordinary course of business".

12     72.     Starting in late 2017 and into early 2018, Mastercard conducted a multinational audit

13  of payment processing companies and banks engaged in direct marketing activities to ensure its

14  rules were being followed.

15     73.     As part of its multinational audit, Mastercard audited Priority, which the GMA

16  business unit was entirely reliant on to book business because Priority, not the GMA business unit,

17  had the direct relationship with the sponsoring bank.

18     74.     Prior to the audit, the GMA business unit placed all of its business, or virtually all of

19  its business, through Priority to Priority's acquiring bank.

20     75.     As a result of the audit, Priority canceled its relationship for the generation of new

21  business with the GMA business unit and stated it would no longer permit the GMA business unit to

22  write new business to any of its partner banks.

23     76.     The GMA business unit had never before had its ISO refuse to take business from it.

24     77.     Thereafter, the GMA business unit failed to secure a new partner banking

25  relationship.

26     78.     Also as a result of the audit, the GMA business unit lost between 75% and 80% of its

27  existing and recurring revenue stream.

28     79.     The loss had a profound and unexpected negative impact on the GMA business unit,

45

1   and quadrupled even Maxwell's most dire projection that the GMA business unit could lose 20% of

2   its merchant portfolio as result of the Mastercard audit.

3      80.    No one in the GMA business unit had ever seen or experienced such outcomes in the

4   industry.

5      81.    As the GMA business unit's head of sales put it to Maxwell in recounting sales

6   figures: "February is when everything fell apart. March zero."

7      82.    Also after the audit, of the merchants that remained in the GMA business unit's

8   portfolio, the chargebacks on those merchants were grossly inflated, causing still greater loss.

9      83.    Further still, Maxwell/IPA concluded that Priority had mishandled merchants booked

10  through Priority by the GMA business unit, in responding to the audit, and that this too had caused

11  significant brand damage to the GMA business unit, and blamed Priority for compounding the

12  severity of the impact of the Mastercard audit on the GMA business unit's prior and existing

13  business.

14     84.    Nonetheless, Maxwell demanded that Priority not only reopen his ability to book

15  business through it, but demanded he be given "exclusivity" with Priority - meaning that he wanted

16  Priority to handle only the GMA business unit's, and no other's, high risk traffic.

17     85.    Maxwell did so, despite admitting at the same time that Priority "will never go for

18  that."

19     86.    Priority never again permitted the GMA business unit to book new business through

20  Priority.

21     87.    Other than his demand for exclusivity with Priority, Maxwell confirmed in April

22  2018 that in the two months since the audit and loss of the Priority relationship, Maxwell/IPA had

23  not approached any new banks, while also conceding that gaining access to a new bank would be

24  difficult in light of tightening banking requirements.

25     88.    In contrast to the GMA business unit, Paysafe/Irvine had lost only a small fraction of

26  its merchants as a result of the audit and retained all of its banking relationships, including

27  Paysafe/Irvine's relationship with Woodforest National Bank.

28     89.    GMA LLC suggested that the GMA business unit utilize the Paysafe/Irvine

46

PRETRIAL ORDER

relationship with Woodforest and write new business through Paysafe/Irvine to Woodforest, at least until Maxwell found a replacement bank for the GMA business unit.

90.     Maxwell and the team under his management resisted doing so as they perceived that Woodforest - with whom they had few dealings - had a more rigorous application and underwriting process.

91.     In February 2018 the GMA business unit's sales team wrote just 1 application to Woodforest that entire month.

92.     In March 2018, the GMA business unit wrote 4 applications.

93.     In April 2018, the GMA business unit wrote 13 applications.

94.     In May 2018, the GMA business unit wrote 9 applications.

95.     This same group had averaged 95 applications per month in the year before the Mastercard audit.

96.     Because it was not generating new business, and because 80% of its existing business was lost and therefore those lost accounts did not need to be serviced, the GMA business unit staff had very little to do during the months leading up to June 2018.

97.     From February through May 29, 2018, GMA LLC continued to employ a sales team (being paid for by GMA LLC), underwriters (being paid for by GMA LLC), and a support staff (being paid for by GMA LLC), despite the fact that the sales team submitted hardly any new merchant applications, which resulted in the underwriters not having anything to underwrite, and the support staff "supporting" a business unit that was not doing much at all.

98.     The few remaining existing merchant accounts began to charge back (where a customer challenges the charge) and attrit (meaning to erode or disappear), and there were next to no new merchant accounts to replace them in the portfolio.

99.     During this time, "pissed off" merchants threatened to file lawsuits against the GMA business unit.

100.    In May 2018, it had been nearly four months since the GMA business unit last resembled itself.

101.    During this time, Maxwell/IPA misled the GMA business unit team that he managed

47
PRETRIAL ORDER

with claims that a new chapter with Priority was right around the corner, though Maxwell knew in March or April of 2018 that the Priority option was not a viable option.

102.    During this time, Maxwell/IPA misled the GMA business unit team that he managed by promoting banking solutions that did not exist.

103.    In May 2018, Maxwell requested that the head of sales alter the GMA business unit's sales forecast for May 2018, stating: "Got off the phone with corporate. They want a sales forecast for GMA through the end of the year by end of today. I know you stand by these numbers you [Trey Smith] and Deon [McKinney] presented, but based on just this month we're way behind with 8 approvals. Do you want to revise these numbers because right now it would make us look like we're not meeting our forecast?"

104.    In two months, from March 2018 to May 2018, the GMA business unit's sales dropped 63%.

105.    In May 2018, the GMA business unit's net income was reported as a loss of $20,521 (a negative 2% net income as a percentage of sales).

106.    This trend of declining sales and profitability was forecasted to extend through at least the end of 2018, which Maxwell stated was his period to begin to recover and which he estimated would take at least 9-12 months but, even then, that recovery would not be "a full 100 percent" and would instead be only "a trajectory of climbing up".

107.    Between late 2017 and May 2018, Paysafe Group personnel regularly met and conversed with Maxwell to discuss how to rectify the issues, including potentially combining the GMA business unit with GMA LLC, all well before May 29, 2018.

108.    Though Maxwell/IPA repeatedly stated that they would provide a written "plan" to turn the GMA business unit around, Maxwell never did.

109.    During this time, Maxwell focused on purchasing property in Las Vegas through another LLC he had formed, and set up his European summer vacation to follow the Rolling Stones tour across six countries.

110.    At this time, the GMA business unit was not acting within its "ordinary course of business consistent with past practice."

111.     On May 29, 2018, the principals of Paysafe Group, Paysafe Irvine, and the GMA business unit (including Danny Chazonoff, Ben Dalfen, Joe Daly and Marc Maxwell) met in Irvine, California to work out the details of a plan.

112.     During this meeting, Maxwell conceded that he had not yet spoken with a new bank, and that even obtaining a new banking relationship - if he could do so - would take many months to achieve.

113.     At the May 29, 2018 meeting it was determined that the GMA business unit would be moved to be integrated with Paysafe/Irvine staff and work along-side (rather than merely adjacent to) Paysafe/Irvine staff and learn the Woodforest Bank relationship and opportunity, while the search for a new banking opportunity for the GMA business unit to replace the one it lost through its loss of the Priority relationship would continue.

114.     Per Maxwell/IPA's request, the plan remained to continue to look for a new and exclusive banking partner for the GMA business unit.

115.     At no time did Maxwell/IPA claim, in the May 29 meeting or at any time prior to his June 22, demand letter, that this meeting or the consensus reached at this meeting, somehow "breached" the ICA, or claim that he had "absolute control" of the GMA business unit such that he would veto any plan to combine the staffs.

116.     The decision to execute on this plan was a consensus decision and mutual, and therefore could not have violated the ICA, regardless of the parties' respective levels of control.

117.     Further, because the GMA business unit was not acting within its "ordinary course of business consistent with past practice," GMA LLC was authorized to act unilaterally had it been required to, to seek to salvage its GMA business unit.

118.     At the May 29, 2018 meeting in Irvine, Maxwell requested an individual employment agreement.

119.     Through early June 2018, Maxwell/IPA actively participated in the combination and stated that they were "on the same page" with GMA LLC concerning it.

120.     Further after the May 29 meeting, and for weeks thereafter, Maxwell/IPA continued to operate under the ICA and to be paid under the ICA.

2164397
ACTIVE 66528800v1

121.    The combination of GMA business unit staff with Paysafe Irvine staff resulted in a significantly improved performance for the GMA business unit sales team, with 75 applications generated during the six-week period GMA LLC combined the business units in June/July.

122.    Maxwell/IPA knew that their compensation under the ICA would be greatly reduced given what had transpired with the GMA business unit as a result of the Mastercard audit and Priority's refusal to accept new business from the GMA business during the preceding months, and Maxwell/IPA repeatedly inquired about the details of a new proposed employment agreement.

123.    On June 21, 2018, Maxwell was sent an executive offer letter proposing new terms for his proposed role as an executive within the Paysafe Group.

124.    The proposed employment agreement would net to Maxwell nearly the same dollars as would be received under the ICA that year, plus entitle him to participate in the executive stock program.

125.    Maxwell was not required to accept or reject this opening proposal, and it was not offered on a take-it-or-leave it basis.

126.    Maxwell could have countered with an offer of his own but did not, nor did he otherwise discuss it.

127.    On the evening of Friday, June 22, 2018 (the day after he received the draft employment agreement), Maxwell/IPA had an attorney send a letter to Danny Chazonoff in Montreal, Canada declaring for the first time that GMA LLC had exceeded its authority to act under the ICA and was therefore in material breach.

128.    Maxwell/IPA's June 22 demand letter also claimed for the first time that GMA LLC materially breached the ICA by sending a draft employment agreement for Maxwell's consideration.

129.    Shortly prior to sending his June 22 demand letter, Maxwell announced that he had decided to book a personal European vacation to follow the Rolling Stones as they toured across the continent and that he would be leaving within days.

130.    Maxwell then travelled to six countries, even extending his vacation.

131.    Following Maxwell/IPA's letter purporting to terminate the ICA, GMA LLC sent Maxwell/IPA a letter on July 11, 2018 rejecting the assertion that it was in breach of the ICA and

1 informing Maxwell/IPA that, in any event, it planned to exercise its contractual right to "cure" the

2 alleged breach, stated how it intended to do so, stated that the cure would be completed shortly,

3 asked whether Maxwell/IPA contended that the cure was inadequate.

4     132.    On July 11, 2018, Maxwell/IPA wrote back but did not identify any deficiency in the

5 promised cure, declined to perform further work under the ICA, and declared that the ICA was

6 "terminated" despite the fact that the cure period had not run.

7     133.    On July 17, 2018, GMA LLC again wrote to Maxwell's counsel and asked if he

8 contended the proposed cure was deficient. Maxwell/IPA did not respond.

9     134.    On July 20, 2018, GMA LLC wrote Maxwell/IPA's counsel a third time, again

10 asking whether Maxwell/IPA contended the proposed cure was inadequate, and requested he

11 confirm he would return to perform his duties on the coming Monday, July 23, 2018.

12     135.    Separately, that same day (July 20, 2018), Maxwell/IPA was informed directly by

13 Paysafe Group's Ben Dalfen, to whom Maxwell was also reporting at the time, that the GMA

14 business unit would be re-separated from Paysafe/Irvine, and that Maxwell/IPA should show up to

15 work on that coming Monday, July 23.

16     136.    On July 21, 2018, Maxwell/IPA's counsel wrote back to GMA LLC stating that

17 Maxwell/IPA could not advise on the sufficiency of the cure, and again (as Maxwell had on July 17)

18 declared the ICA to be terminated despite the cure provisions of the ICA.

19     137.    Maxwell/IPA conceded he knew throughout this period that GMA LLC was trying to

20 cure, that he reviewed the back and forth among counsel about the cure, but that he did not follow

21 up with anyone from GMA LLC about the topics.

22     138.    On July 23, 2018, GMA LLC timely implemented the cure steps and announced the

23 recombination to the GMA business unit employees.

24     139.    GMA business unit employees were instructed to report to Maxwell, and to perform

25 their duties as they had done prior to the combination.

26     140.    Maxwell/IPA thereafter failed or refused to respond to his staff's requests for

27 direction.

28     141.    Maxwell/IPA did not return to work on July 23, 2018 or thereafter to evaluate the

2164397
ACTIVE 66528800v1

1    sufficiency of the cure and had no conversation with anyone to evaluate the cure steps.

2        142.    The ICA provided that Maxwell/IPA's compensation would be calculated on a

3    quarterly and annual basis based on the EBITDA of the GMA business unit.

4        143.    GMA LLC continued to pay Maxwell/IPA quarterly bonuses and retainer fees

5    throughout this entire period and up until August 2018, and Maxwell/IPA accepted all payments

6    made by GMA LLC through August 2018.

7        144.    Between 2016 and mid-2018, Maxwell/IPA were paid more than $9 million in

8    compensation under the ICA for this 2 ½ year period of time.

9        145.    The ICA also contained a one-way "liquidated damage" clause whereby

10   Maxwell/IPA could recover the same sum for breach - large or small - defined as "Good Reason" by

11   the ICA.

12       146.    The parties did not negotiate and discuss a reasonable projection of actual damages

13   under the various scenarios contemplated by the liquidated damages provision.

14       147.    Such "Good Reason" breaches included, among other things, any underpayment of

15   the "Consultant Fee," even by $1.00, an office relocation beyond 50 miles, or a failure to pay for the

16   gardening for the Los Angeles home GMA LLC provided Maxwell.

17       148.    When Maxwell/IPA first claimed a breach of the ICA by GMA LLC, Maxwell/IPA

18   claimed this one-size-fits-all liquidated damages provision required a payment of $13,691,833.56

19   (plus interest).

20       149.    Maxwell/IPA's designated expert testified that a more than $13 million recovery for

21   some "Good Reason" breaches would not be a reasonable estimate of damages in his opinion.

22       150.    Maxwell/IPA's designated expert Irwin Nachimson testified to numerous ambiguities

23   within the language of the liquidated damage provision of the ICA that would need to be resolved

24   before the size of the liquidated damage recovery could be calculated for a given time period.

25       151.    Maxwell/IPA's designated expert Irwin Nachimson looked at the wrong balance

26   sheets to determine that IPA was adequately capitalized.

27       152.    Maxwell/IPA's designated expert Irwin Nachimson testified to his belief that IPA

28   was managed by "GMA".

2164397

ACTIVE 66528800v1

153.    Maxwell/IPA's designated expert Irwin Nachimson testified to his belief that IPA and the GMA business unit were "one and the same."

154.    Maxwell/IPA's designated expert Irwin Nachimson's method for calculation of the liquidated damage recovery under the ICA, and resultant sum for a liquidated damage recovery, changed between his various expert reports, as he identified new ways to interpret the language of the ICA.

155.    Maxwell/IPA's designated expert Irwin Nachimson raised issues for this first time in his rebuttal report that were not disclosed in his original report, and that do not rebut issues or opinions in Paysafe's expert report, including the opinion that IPA was adequately capitalized.

156.    Maxwell/IPA's designated expert Patrick Moran testified there are a number of topics in his report that are not the subject of his expert opinions, including (a) "background facts" in Moran's expert report, (b) whether "Paysafe's purported reason for eliminating GMA being account closures was pre-textual," (c) whether GMA LLC materially breached the ICA, (d) whether Maxwell did a good job at managing the GMA Business Unit after January 2018, (e) whether a liquidated damage clause that is not a reasonable projection of future damages is invalid as a matter of law, and (f) Maxwell's ability to mitigate IPA's alleged damages.

157.    Maxwell/IPA's designated expert Patrick Moran raised issues for this first time in his rebuttal report that were not disclosed in his original report, and that do not rebut issues or opinions in GMA LLC's expert's report, including the opinion that "I would expect industry participants, including the parties to this agreement, to understand the 'ordinary course of business' to mean operation by GMA in the payments industry by selling and managing Merchant accounts. That is how Mr. Maxwell understood that provision."

158.    Maxwell/IPA's designated expert Patrick Moran opined on matters for which he admitted he has no factual basis, including the opinion that compliance audits were "a common occurrence, and part of the ordinary course of business."

159.    Maxwell/IPA's designated expert Patrick Moran opined on matters for which he admitted he has no factual basis, including the opinion that "Paysafe's decision to absorb GMA and thus eliminate the market perception of GMA's separateness and eliminate GMA as a unique option

1   would have been expected to reduce GMA's revenues."

2       160.    Maxwell/IPA's designated expert Patrick Moran opined on matters for which he

3   admitted he has no factual basis, including the opinion that "Paysafe assumed control of GMA

4   because Paysafe wished to use GMA's staff and reputation to increase Paysafe's presence in the

5   high-risk Nutra segment while at the same time eliminating the need to pay IPA."

6       161.    Maxwell/IPA's designated expert Patrick Moran opined on matters for which he

7   admitted he has no factual basis, including the opinion that Paysafe slowed down discussions with

8   Synovus Bank.

9       162.    Maxwell/IPA's designated expert Patrick Moran opined on matters for which he

10  admitted he has no factual basis, including the opinion that "once the market became aware that

11  Paysafe had absorbed GMA, the merchants' previous perception and take-away regarding GMA's

12  individualized and independent status was lost and would be very difficult to reestablish."

13  **V.     <u>STATEMENT OF CONTESTED ISSUES OF LAW</u>**

14      Set forth below are each party's statement of contested issues of law, by topic. The headings

15  below are for organizational purposes only, and the parties stipulate that the headings shall not be

16  interpreted to mean that the issues appearing below a given heading apply only to the particular

17  claim or issue specified in the heading.  The following is not intended to set forth every possible

18  legal issue that a trial of this action may entail, including issues to be raised in separate motions in

19  limine, but is intended to provide an overview of significant issues to be resolved in this action.

20      **A.     <u>IPA/Maxwell's Claims for Breach of Contract and/Breach of the Implied</u>**

21          **<u>Covenant of Good Faith and Fair Dealing</u>**

22              *IPA/Maxwell's Statement of Issues Of Law*

23  1.      Whether (as Paysafe US contends) each ICA negative covenant gives Paysafe US an

24  implied inverse right to do anything not barred by that negative covenant.

25  2.      Whether (as IPA contends) absent express contractual language, separate covenants

26  in a contract do not operate as a constraint on or exception to each other.

27  3.      The meaning and scope of the "complete control," "ordinary course of business," and

28  the "reduction of revenue" covenants.

4.      Whether an offer to cure is an admission of breach.

5.      Whether IPA could acquiesce to Paysafe US's conduct without providing prior written consent per the terms of the ICA.

6.      Whether Paysafe US's prior breach argument and related arguments (e.g., breach of implied covenant of good faith and fair dealing, unclean hands) are barred by Paysafe US's failure to provide written notice of any alleged breach of the ICA by IPA before June 22, 2018 (the date when IPA gave notice of termination of the ICA).

7.      Whether any aspect of IPA or Maxwell's alleged conduct at issue in this litigation (if proved) would constitute bad faith conduct sufficient to support a claim for breach of the implied duty of good faith and fair dealing or unclean hands.

8.      Whether Paysafe's implied covenant of good faith and fair dealing or unclean hands arguments are contrary to the express terms of the ICA.

9.      Which annual bonus payment is properly used in calculating IPA's liquidated damages under the ICA.

10.      Which quarterly bonus payments are properly used in calculating liquidated damages under the ICA.

11.      The manner in which the quarterly bonus tiers in Exhibit A to the ICA should be applied in calculating IPA's quarterly bonuses.

12.      Whether any of Paysafe US's breaches of the ICA were curable, and if so, which ones.

13.      The date of Paysafe US's deadline under the ICA to cure any curable breaches of the ICA.

14.      Whether IPA owed Paysafe US a duty to opine as to the effectiveness of Paysafe US's purported cure.

15.      Whether it is possible to ratify a proposed cure.

16.      Whether Paysafe US waived its ratification argument by not asserting it as an affirmative defense.

17.      Whether ratification is possible in a case involving a contract provision requiring all

modifications to be in writing and stating that waiver of one breach does not waive any succeeding breaches.

18.    Whether a failure to return a small electronic payment whose purpose is unidentified on a bank statement can constitute a waiver of an 8-figure damages claim?.

19.    Whether a breach of a non-monetary covenant is curable.

20.    Whether a breach that goes to the essence of an agreement or destroys trust between the parties is curable.

21.    Whether IPA properly terminated the ICA, and when the ICA was terminated.

22.    Whether IPA owed any duties to Paysafe US after termination of the ICA.

***GMA LLC's Statement of Issues Of Law***

1.    Whether Maxwell/IPA agreed to the combination of the GMA business unit with Paysafe/Irvine in June 2018, such that there could be no breach by GMA LLC under the ICA.

2.    If Maxwell/IPA had complete control of the GMA business unit as they claim, whether the combination of the GMA business unit owned by GMA LLC with Paysafe/Irvine in June 2018 have occurred absent Maxwell/IPA's agreement.

3.    Whether Maxwell/IPA ratified a plan to combine the staff of the GMA business unit with that of Paysafe/Irvine by participating in the plan for weeks, promoting it for weeks, stating they were on the "same page," and continuing to work under the ICA and accept payments under the ICA for weeks, such that they could not later claim the combination breached the ICA and thus cannot recover on that claim.

4.    Whether Maxwell/IPA are estopped to claim breach of the ICA by ratifying a plan to combine the staff of the GMA business unit with that of Paysafe/Irvine, by having participated in the plan for weeks, promoted it for weeks, stated they were on the "same page," and continued to work under the ICA and accept payments under the ICA for weeks, such that they could not later claim the combination breached the ICA and thus cannot recover on that claim.

5.    Apart from consent by Maxwell/IPA, ratification or estoppel, whether the ICA permitted GMA LLC to intervene in the management of the GMA business unit in late May 2018.

6.    Whether the GMA business unit's loss of the Priority relationship caused it to no

2164397
*ACTIVE 66528800v1*

1  longer be operating in its ordinary course of business consistent with past practice such that the ICA

2  permitted GMA LLC to act unilaterally concerning its GMA business unit.

3        7.      Whether a general failure by the GMA business unit to write business to its only

4  remaining option – Woodforest Bank through Paysafe/Irvine's relationship – placed the GMA

5  business unit outside its ordinary course of business consistent with past practice such that the ICA

6  permitted GMA LLC could act unilaterally concerning its GMA business unit.

7        8.      Whether the GMA business unit's loss of 70-80% of its merchant accounts placed the

8  GMA business unit outside its ordinary course of business consistent with past practice such that the

9  ICA permitted GMA LLC to act unilaterally concerning its GMA business unit.

10        9.      Whether the GMA business unit's plummeting financials performance from February

11  to May 2018, including to a negative net revenue for May 2018, placed the GMA business unit

12  outside of its ordinary course of business consistent with past practice such that the ICA permitted

13  GMA LLC to act unilaterally concerning its GMA business unit.

14        10.      Whether the result of the Mastercard Audit constituted an event outside the GMA

15  business unit's ordinary course of business consistent with past practice such that the ICA permitted

16  GMA LLC to act unilaterally concerning its GMA business unit.

17        11.      The legal meaning of the phrase "ordinary course of business consistent with past

18  practice" and its usage in the ICA, and whether there was a meeting of minds on the meaning of this

19  ICA term.

20        12.      The legal meaning of the phrase "Independent Contract shall manage, and have

21  complete control over the operation of, the business unit of the Company [GMA LLC] referred to as

22  'GMA' consistent with the Company's delegated authority matrix ('Services')" and its usage in the

23  ICA, and whether there was a meeting of minds on the meaning of this ICA term.

24        13.      The legal meaning of the phrase "The authority vested in the Independent Contractor

25  shall include … mutually agreeing with the Company on the budget for all aspects of the operation

26  of the GMA business unit" and its usage in the ICA, and whether there was a meeting of minds on

27  the meaning of this ICA term.

28        14.      The legal meaning of the phrase "The Company further agrees that it will not take

any action with respect to the operation of the GMA business unit that could reasonably be expected to have the effect of decreasing the gross revenue" and its usage in the ICA, and whether there was a meeting of minds on the meaning of this ICA term.

15.     Whether the ICA can be orally amended, such that it could be breached by the failure to provide an employment agreement to Mr. Maxwell's liking.

16.     Whether the ICA orally was amended in May 2018 to require  GMA LLC to provide Mr. Maxwell an employment agreement to his liking.

17.     Whether any oral promise to require  GMA LLC to provide Mr. Maxwell an employment agreement to his liking, was sufficiently definite so as to create an enforceable contract.

18.     Whether GMA LLC materially breached the terms of the ICA, including a failure to timely cure any prior breach pursuant to the terms of the ICA of which Maxwell/IPA complained.

19.     If GMA LLC did materially breach the terms of the ICA and also did not thereafter cure such breach pursuant to the terms of the ICA, whether Maxwell/IPA breached the covenant of good faith and fair dealing in its interaction with GMA LLC concerning GMA LLC's efforts to cure any such breach such that Maxwell/IPA cannot recover under the ICA.

20.     If GMA LLC did materially breach the terms of the ICA and also did not thereafter cure such breach pursuant to the terms of the ICA, whether Maxwell/IPA engaged in unclean hands in their interactions with GMA LLC after such breach such that ICA/Maxwell cannot recover under the ICA.

21.     Whether GMA LLC timely cured any breach of the ICA per the cure terms of the ICA.

22.     If GMA LLC did not breach the ICA, or breached the ICA but then cured such breach, whether Maxwell/IPA then breached the ICA by failing to return to work on July 23, 2018 or thereafter, such that ICA/Maxwell cannot recover under  the ICA.

23.     Whether Maxwell/IPA ratified GMA LLC's efforts to cure of any breach  by Maxwell/IPA continuing to accept payment under the ICA for weeks thereafter without a claim of breach.

24.     Whether Maxwell/IPA are estopped to claim GMA LLC did not cure any breach of

2164397
ACTIVE 66528800v1

the ICA by Maxwell/IPA's continuing to accept payment under the ICA for weeks thereafter.

25.    Whether Maxwell/IPA engaged in anticipatory breach of the ICA before expiration of the cure period when they repeatedly declared that the ICA was terminated, and then failed to perform under the contract, such that Maxwell/IPA cannot recover under the ICA.

26.    Whether Maxwell/IPA were actually damaged by any alleged breach of the ICA.

27.    Whether evidence of the reason for GMA LLC's supposed breach of the ICA is admissible on Maxwell/IPA's breach of contract claims.

28.    Whether Maxwell/IPA can recover sums allegedly due for prior work efforts where Maxwell/IPA failed to provide notice of such claim as required by the ICA.

29.    Whether Maxwell/IPA can recover sums scheduled for payment in the future if Maxwell/IPA materially breached the ICA before those payments were scheduled for payment.

30.    Whether Maxwell/IPA can recover sums scheduled for payment in the future if Maxwell/IPA engaged in unclean hands concerning the ICA before those payments were scheduled for payment.

31.    Whether a party who seeks to recover damages on a supposed breach of contract claim, but fails to provide a computation of such damages in its Rule 26 disclosure, is barred from seeking or recovering such damage.

32.    Whether the liquidated damage provision of the ICA is an invalid penalty or otherwise unenforceable.

33.    Whether the liquidated damage provision of the ICA, which sets forth a single penalty amount for any "Good Reason" breach of the ICA (regardless of the amount or even magnitude of damage), is an unlawful penalty because it is not a reasonable effort to approximate actual damage.

34.    Whether the liquidated damage provision of the ICA, to the extent it excludes from its calculation the GMA business unit's performance most proximate to the claimed breach, is unlawful because it is not a reasonable effort to approximate actual damage.

35.    Which annual period is properly used in calculating IPA's liquidated damages under the ICA, and whether there was a meeting of the minds concerning this.

2164397
ACTIVE 66528800v1

36.     Which quarterly period is properly used in calculating liquidated damages under the ICA, and whether there was a meeting of the minds concerning this.

37.     The manner in which the bonus tiers in Exhibit A to the ICA should be applied in calculating bonuses, and whether there was a meeting of the minds concerning this.

38.     Whether there was a meeting of the minds concerning the terms of the liquidated damage provision.

39.     Whether the liquidated damage provision of the ICA is impermissibly vague as to how damages would be calculated under the provision such that it is not an enforceable contract provision.

40.     Whether the liquidated damage provision is otherwise impermissibly vague such that it cannot be enforced.

41.     Whether calculation of damages under the liquidated damage provision is sufficiently definite such that interest could be recovered on such liquidated damages.

42.     Whether a party seeking to invalid a liquidated damage provision must possess "market power."

43.     Whether a party that seeks the benefit of a liquidated damage provision, but fails to plead facts establishing that the liquidated damage provision was valid at the time it was entered, can recover liquidated damage.

44.     Whether Maxwell/IPA's failure to provide a computation of damages under Rule 26 bars assertion at trial of their affirmative claims that include damages as a required element.

**B.     <u>GMA LLC's Claims for Breach Of Contract And Breach Of The Implied Covenant Of Good Faith And Fair Dealing</u>**

*GMA LLC's Statement of Issues Of Law*

1.     Whether Maxwell/IPA breached the ICA, including the covenant of good faith and fair dealing, by failing to discharge their duties as manager of the GMA business unit.

2.     Whether Maxwell/IPA breached the ICA, including the covenant of good faith and fair dealing, by their response (or lack thereof) to the fallout from the Mastercard Audit or loss of the Priority relationship.

3.      Whether Maxwell/IPA breached the ICA, including the covenant of good faith and fair dealing, by soliciting an employment agreement with GMA LLC and then claiming the provision of a draft of same was a breach of the ICA.

4.      Whether Maxwell/IPA breached the covenant of good faith and fair dealing by first participating and cooperating in the June 2018 combination with Paysafe/Irvine for weeks, and then weeks later stating that the combination was not authorized by Maxwell/IPA and therefore was a supposed "breach" of the ICA by GMA LLC.

5.      Whether Maxwell/IPA breached the ICA, including the covenant of good faith and fair dealing, by unilaterally terminating the contract and then refusing to work, prior to expiry of the cure period.

6.      Whether Maxwell/IPA breached the ICA, including the covenant of good faith and fair dealing, or the express terms of the ICA, when they failed to appear for work at the end of the cure period, including while continuing to receive and accept monthly retainer payments under the ICA.

7.      Whether Maxwell/IPA breached the ICA, including the covenant of good faith and fair dealing, by refusing to perform work under the ICA after sending their June 22 demand letter, and instead travelling to Europe to follow the Rolling Stones tour, including while continuing to receive and accept monthly retainer payments under the ICA.

8.      Whether Maxwell/IPA breached the ICA, including the covenant of good faith and fair dealing, or the express terms of the ICA, when they failed to appear for work at the end of the cure period, including while continuing to receive and accept monthly retainer payments under the ICA.

### *IPA/Maxwell's Statement of Issues Of Law*

9.      Whether Paysafe US's breach of contract and implied covenant of good faith and fair dealing arguments fail as a matter of law because they are contrary to the express terms of the ICA regarding, among other things, IPA's discretion in managing the GMA business unit.

10.      Whether Paysafe US's breach of contract and implied covenant of good faith and fair dealing arguments fail as a matter of law because Paysafe US waived any such arguments by failing

2164397

*ACTIVE 66528800v1*

to provide timely notice of any alleged breach of the ICA by IPA as required under the ICA and California law, and by failing to terminate when it became aware of IPA's alleged breaches of the ICA.

11.     Whether, under the ICA, IPA had a duty to undertake any of the actions Paysafe US's alleges it had a duty to undertake.

12.     Whether, under the ICA, IPA had a duty to refrain from any of the actions Paysafe US alleges it had a duty not to undertake.

13.     Whether any of the alleged conduct or inaction of IPA or Maxwell relied on by Paysafe US in support of its breach of implied covenant of good faith and fair dealing claim supports a finding of bad faith sufficient to support Paysafe US's claim.

14.     Whether Paysafe US can offer evidence regarding, or establish, any damages as required to prove its breach of contract and breach of implied covenant of good faith and fair dealing arguments.

15.     Whether evidence concerning Maxwell's vacation is admissible.

16.     Whether evidence concerning Maxwell's conduct after he gave notice of intent to terminate the ICA, or after the effective date of that termination, is admissible?

17.     Whether evidence concerning IPA's alleged failure to discharge its duties as manager of the GMA business unit after IPA was removed from that position by Paysafe in early June 2018 is admissible.

18.     Whether IPA owed Paysafe US a duty to opine as to the effectiveness of Paysafe US's purported cure.

19.     Whether it is possible to ratify a proposed cure.

20.     Whether Paysafe US waived its ratification argument by not asserting it as an affirmative defense.

21.     Whether ratification is possible in a case involving a contract provision requiring all modifications to be in writing and stating that waiver of one breach does not waive any succeeding breaches.

22.     Whether a failure to return a small electronic payment whose purpose is unidentified

on a bank statement can constitute a waiver of an 8-figure damages claim.

23.     Whether a breach of a non-monetary covenant is curable.

24.     Whether a breach that goes to the essence of an agreement or destroys trust between the parties is curable.

25.     Whether IPA properly terminated the ICA, and when the ICA was terminated.

**C.     GMA LLC's Claim For Declaratory Relief Concerning the Liquidated Damages Provision In The ICA**

*GMA LLC's Statement of Issues Of Law*

1.      Whether the liquidated damage provision of the ICA is unlawful and unenforceable.

2.      Whether the liquidated damage provision of the ICA, which sets forth a single penalty amount for any "Good Reason" breach of the ICA (regardless of the amount or even magnitude of damage), is an unlawful penalty because it is not a reasonable effort to approximate actual damage.

3.      Whether the liquidated damage provision of the ICA, to the extent it excludes from its calculation the GMA business unit's performance most proximate to the claimed breach, is unlawful because it is not a reasonable effort to approximate actual damage.

4.      Which annual period is properly used in calculating IPA's liquidated damages under the ICA, and whether there was a meeting of the minds concerning this.

5.      Which quarterly period is properly used in calculating liquidated damages under the ICA, and whether there was a meeting of the minds concerning this.

6.      The manner in which the bonus tiers in Exhibit A to the ICA should be applied in calculating bonuses, and whether there was a meeting of the minds concerning this.

7.      Whether there was a meeting of the minds concerning the terms of the liquidated damage provision.

8.      Whether the liquidated damage provision of the ICA is impermissibly vague as to how damages would be calculated under the provision such that it is not an enforceable contract provision.

9.      Whether the liquidated damage provision is otherwise impermissibly vague such that

2164397
*ACTIVE 66528800v1*

1   it cannot be enforced.

2       10.     Whether calculation of damages under the liquidated damage provision is sufficiently

3   definite such that interest could be recovered on such liquidated damages.

4       11.     Whether a party seeking to invalidate a liquidated damage provision must possess

5   "market power."

6       12.     Whether a party that seeks the benefit of a liquidated damage provision, but fails to

7   plead facts establishing that the liquidated damage provision was valid at the time it was entered,

8   can recover liquidated damage.

9                   ***IPA/Maxwell's Statement of Issues Of Law***

10      1.     Whether Paysafe US waived its Declaratory Relief claim re Liquidated Damages by

11  failing to disclose in its pleading or relevant Interrogatory Response the facts it now relies upon in

12  support of this claim.

13      2.     Whether Paysafe US has waived its opportunity to prove IPA had market power in a

14  relevant market at the time when the parties executed the ICA in July 2017 by failing to allege or

15  disclose in its pleading, relevant interrogatory response, or expert opinions any facts that would

16  support such a finding.

17      3.     Whether Paysafe US has waived its opportunity to prove that the ICA's liquidated

18  damages clause was unreasonable under the circumstances existing at the time the contract was

19  executed by failing to allege or disclose in its pleading, relevant interrogatory response, or expert

20  opinion any facts that would support such a finding.

21      4.     Whether evidence and grounds omitted from Paysafe US's pleading and relevant

22  interrogatory response regarding its Declaratory Relief claim re Liquidated Damages are admissible

23  at trial.

24      5.     Whether the ICA's liquidated damages clause was unreasonable under the

25  circumstances existing at the time the contract was made.

26      6.     Whether the payout under the ICA's liquidated damages clause bears no reasonable

27  relationship to the range of possible damages that could be anticipated at the time of contracting.

28      7.     Whether, absent a liquidated damages clause, damages for breach of contract in a

64
PRETRIAL ORDER

case involving an early termination clause are the profits the terminating party would have earned

during the remaining term of the contract.

8.      Whether, in order to invalidate the ICA's liquidated damages clause, Paysafe US is

required to prove IPA coerced Paysafe US into agreeing to the ICA's liquidated damages clause by

using market power it possessed in a relevant market at the time when the parties entered into the

ICA.

9.      Whether IPA had market power in a relevant market at the time when the parties

executed the ICA in July 2017.

**D.      GMA LLC's Claim For Breach Of Fiduciary Duty**

*GMA LLC's Statement Of Issues Of Law*

1.      Whether IPA or Maxwell owed GMA LLC a fiduciary duty.

2.      The type and scope of any fiduciary duty or duties owed by IPA or Maxwell to GMA

LLC.

3.      Whether IPA or Maxwell breached a fiduciary duty owed to GMA LLC.

*IPA/Maxwell's Statement of Additional Issues*

1.      Whether Paysafe US has waived a breach of fiduciary duty claim based on IPA and

Maxwell's alleged manufacturing of breaches of the ICA by not citing any facts supporting this

theory in its relevant interrogatory response.

2.      Whether Paysafe US can prove its breach of fiduciary duty claim based on

Maxwell's alleged breach of the duty of loyalty given the absence of evidence supporting Paysafe

US's allegation that Maxwell declined to find a new bank because he had an agreement with Priority

Bank that provided him with lucrative personal benefits.

3.      Whether IPA or Maxwell owed Paysafe US a fiduciary duty.

4.      The type and scope of any fiduciary duty or duties owed by IPA or Maxwell to

Paysafe US.

**E.      Affirmative Defenses**

*GMA LLC's Statement of Issues Of Law*

1.      Whether a breach by Maxwell/IPA of the ICA's express provisions or its covenant of

65

good faith and fair dealing precludes Maxwell/IPA from recovering under the ICA.

2.     Whether Maxwell/IPA engaged in unclean hands by their premature claims that the ICA was terminated before the cure period had elapsed, including while they continuing to receive and accept monthly retainer payments under the ICA.

3.     Whether Maxwell/IPA engaged in unclean hands such that they cannot recover under the ICA for any supposed "breach" by GMA LLC, by Maxwell/IPA's refusal to perform work under the ICA after sending their June 22 demand letter, and instead travel to Europe to follow the Rolling Stones tour, including while continuing to receive and accept monthly retainer payments under the ICA.

4.     Whether Maxwell/IPA engaged in unclean hands by their refusals to interact concerning the cure, including while continuing to receive and accept monthly retainer payments under the ICA.

5.     Whether Maxwell/IPA engaged in unclean hands by their failure to appear for work at the end of the cure period, including while continuing to receive and accept monthly retainer payments under the ICA.

6.     Whether Maxwell/IPA are estopped from claiming a "breach" by GMA LLC of the ICA in early June 2018 because Maxwell/IPA signaled that agreed to the changes through their actions and writings in June 2018.

7.     Whether GMA LLC's obligations to Maxwell/IPA, if any, been satisfied or excused.

8.     Whether any breach of the ICA claimed by Maxwell/IPA was timely cured by GMA LLC.

9.     Whether Maxwell/IPA failed to mitigate damages.

10.    Whether GMA LLC was not the proximate cause of the alleged damages, if any, sustained by Maxwell/IPA.

11.    Whether Maxwell/IPA are barred from recovery because they failed to satisfy a condition precent and/or a condition subsequent.

12.    Whether, at all relevant times, GMA LLC performed or discharged in good faith each and every obligation, if any, owed to GMA LLC.

2164397
ACTIVE 66528800v1

13.     Whether claims for damages or other monetary recover by Maxwell/IPA should be barred as such recovery would result in unjust enrichment of Maxwell/IPA.

14.     Whether the liquidated damages provision upon which Maxwell/IPA rely is an unenforceable penalty.

15.     Whether Maxwell/IPA's failure to provide a computation of damages under Rule 26 bars assertion at trial of their claims and affirmative defenses that include damages as a required element.

### *IPA/Maxwell's Statement of Issues Of Law*

1.     Whether Paysafe US has alleged adequate facts sufficient to support any of its affirmative defenses.

2.     Whether Paysafe US has a non-frivolous basis to assert any of its affirmative defenses.

3.      Whether Paysafe US has waived its prior breach defense (and any other defenses based on IPA's alleged breach of the ICA, such as unclean hands) by failing to provide timely notice of any such breach to IPA as required under the ICA and California law, and by failing to terminate the ICA.

4.     Whether Paysafe US's prior breach defense (and any other defenses based on IPA's alleged breach of the ICA, such as unclean hands) are barred by the provisions of the ICA providing broad discretion as to how IPA could manage GMA.

5.     Whether any of IPA or Maxwell's alleged bad acts can constitute bad faith conduct sufficient to support a defense of unclean hands.

6.     Whether, under the ICA, IPA had a duty to undertake any of the actions Paysafe US alleges it had a duty to undertake.

7.     Whether, under the ICA, IPA had a duty to refrain from any of the actions Paysafe US alleges it had a duty not to undertake.

8.     Whether evidence concerning Maxwell's vacation is admissible.

9.     Whether evidence concerning Maxwell's conduct after he gave notice of intent to terminate the ICA, or after the effective date of that termination, is admissible?

2164397
ACTIVE 66528800v1

10.     Whether evidence concerning IPA's alleged failure to discharge its duties as manager of the GMA business unit after IPA was removed from that position by Paysafe in early June 2018 is admissible.

11.     Whether evidence concerning purported "signaling" by Maxwell that he agreed to the changes in IPA's role in the management of GMA is admissible given the fact that he objected to these changes orally and in writing, and neither IPA nor maxwell provided writings agreeing to modifications of the ICA or waiver of breaches by Paysafe.

12.     Were Paysafe US's breaches of the ICA curable, and if so, were they cured in a timely manner?

13.     Is IPA required to mitigate its damages arising from a contract with a liquidated damages clause?

14.     Whether Paysafe US's reliance on affirmative defenses not specifically identified in its Answer (including accord and satisfaction; arbitration and award; assumption of risk; contributory negligence; duress; estoppel; failure of consideration; fraud; illegality; injury by fellow servant; laches; license; payment; release; res judicata; statute of frauds; statute of limitations; and waiver) is barred by the Court's April 1, 2022 ruling., or by general pleading rules.

15.     Does Paysafe US's failure to provide a computation of damages as required under Rule 26 bar its assertion at trial of its affirmative claims and affirmative defenses that include damages as a required element?

**F.     <u>Alter Ego</u>**

*GMA LLC's Statement of Issues Of Law*

1.     Whether Maxwell and IPA alter egos or each other such that each is responsible for the actions and liabilities of the other.

*IPA/Maxwell's Statement of Issues Of Law*

1.     Which state's laws apply to the alter ego issue raised by Paysafe US?

2.     Whether Paysafe US has alleged or can offer at trial facts necessary to support an alter ego finding (*e.g.*, that an alter ego finding is necessary to prevent fraud) given Paysafe US's admission that it is not seeking to recover any damages?

68
PRETRIAL ORDER

3.      Whether an alter ego finding has any relevance to this dispute, given Paysafe US's admission that it is not seeking to recover any damages and is now basing its liquidated damages argument on the premise that IPA (not Maxwell) was an employee of Paysafe US.

**G.      Expert Issues**

*GMA LLC's Statement of Issues Of Law*

1.      Whether the "opinions" offered by Maxwell/IPA's experts are permissible and admissible, or should be excluded under the standards set forth in *Daubert* and similar decisions?

2.      Whether Maxwell/IPA's experts can testify about purported facts that are not the subject of their expert opinions.

4.      Whether Maxwell/IPA's experts can testify about matters they admitted in deposition were not the subject of their expert opinions.

5.      Whether Maxwell/IPA's experts can testify to opinions first raised in their rebuttal reports.

6.      Whether Maxwell/IPA's experts can testify to matters for which they have no factual basis.

*IPA/Maxwell's Statement of Additional Issues*

1.      Whether the "opinions" offered by Paysafe US's expert are permissible and admissible, or should be excluded under the standards set forth in *Daubert* and similar decisions?

2.      Whether Paysafe US's expert testify as to opinions that are based on the wrong legal standard.

3.      Whether Paysafe US's expert can testify about purported facts that are not the subject of his expert opinions?

4.      Whether Paysafe US's expert can testify about matters he admitted in deposition were not the subject of his expert opinions?

5.      Whether Paysafe US's expert can provide opinions regarding contract interpretation issues?

6.      Whether Paysafe US's expert can testify about matters for which he has no factual basis?

2164397

*ACTIVE 66528800v1*

## VI.   <u>OTHER MATERIAL ISSUES OF LAW</u>

### IPA/Maxwell's Statement of Issues Of Law

1.      Whether Paysafe US's disclaimer of compensatory damages on its affirmative claims bars Paysafe US from recovering punitive damages.

2.      Whether Paysafe US's failure to provide a computation of any damages in its Rule 26 Initial Disclosure and damages expert report precludes Paysafe US from arguing to the jury or court at trial that it has suffered any damages based on its affirmative claims or affirmative defenses.

### GMA LLC's Statement of Issues Of Law

1.      The bifurcation of legal issues to be determined by the Court from the issue to be determined by the jury, and when such legal issues for the Court's determination, including the validity of the liquidated damage provision, will be determined by the Court.

2.      Whether Maxwell/IPA's failure to provide a computation of damages under Rule 26 bars assertion at trial of their claims and affirmative defenses that include damages as a required element.

## VII.   <u>TRIAL EXHIBITS</u>

1.       The following exhibits are stipulated into evidence in this case and may be so marked by the clerk:

        None.

2.      As to the following exhibits, the party against whom the same will be offered objects to their admission on the grounds stated within the relevant Appendices referred to below. The parties also reserve the right to supplement and amend their objections, including for documents for which no objection is currently listed, throughout the pretrial meet and confer process and at trial, in response to motions in limine, Daubert motions, Court rulings, and the context within which the evidence is presented.

Further, the parties objections depend in part on how the other side may attempt to use the documents at trial, the purpose for which they are offered, and rulings that the Court will make on anticipated motions in limine.  By way of example only, many of the exhibits consist of email chains authored by individuals who are not employees of the opposing party and contain hearsay

within hearsay, as well as numerous types of otherwise objectionable material, and it is sometimes impossible from each party's designations to discern what portions of those email chains it actually intends to attempt to use at trial, and in what manner. Many of these documents were also produced as confidential under the protective order in this case, and the parties will need to work with one another and the Court as to how to handle confidential designations at trial. This is a preliminary list of objections, and the parties reserves their right to amend this list and to object as appropriate at trial in the context of evidence ultimately presented.

                a.     IPA/Maxwell's Exhibits and Objections to Them.

See Appendix A attached hereto.

                b.     GMA LLC's Exhibits and Objections to Them.

(See Appendix B attached hereto.)

        3.     Electronic evidence.

        The parties  intend to present evidence at trial in electronic format to jurors for purposes of jury deliberation.

        4.     Depositions:

                a.     IPA/Maxwell will offer the following deposition excerpts:

(See Appendix C attached hereto.)

                b.     GMA LLC will offer the following deposition excerpts:

(See Appendix D attached hereto.)

                c.     Objections to depositions:

        The parties reserve the right to supplement and amend their objections, including for designations for which no objection is currently listed, throughout the pretrial meet and confer process and at trial, in response to motions in limine, Daubert motions, Court rulings, and the context within which the evidence is presented.

        Further, the parties objections depend in part on how the other side may attempt to use the designations at trial, the purpose for which they are offered, and rulings that the Court will make on anticipated motions in limine. By way of example only, many of the designations contain hearsay within hearsay, as well as numerous types of otherwise objectionable material, and it is sometimes

1  impossible from the other side's designations to discern what portions of those designations they

2  actually intend to attempt to use at trial, and in what manner.  The parties will also need to work

3  with one another and the Court as to how to handle confidential designations at trial. The parties

4  reserve their rights to amend their preliminary objections and to object at trial as appropriate in the

5  context of evidence ultimately presented.

6              i.        GMA LLC objects to IPA/Maxwell's deposition excerpts as follows:

7  (See Appendix E attached hereto.)

8              ii.       IPA/Maxwell objects to GMA LLC's deposition excerpts as follows:

9  (See Appendix F attached hereto.)

10  **VIII.    <u>WITNESS LISTS</u>**

11          These designations are preliminary and conditional.  Any designation or agreement to

12  introduction of a witness depends on, among other things, evidentiary rulings by the Court,

13  including on motions in limine, (the purpose for which a witnesses' testimony is sought to be

14  admitted, and the offering party.  At this time, the parties reserve the right to call each of an

15  opposing party's witnesses. The parties also reserve the right to call additional witnesses for

16  purposes of impeachment or rebuttal at trial. The parties further reserve the right to call any witness,

17  either live or by deposition, identified on the opposing party's witness list. Finally, the parties

18  reserve the right to narrow or amend the witness lists to account for court

19  rulings, further proceedings, further stipulations, or further meeting and conferring. Subject to the

20  foregoing, the following witnesses may be called by the parties at trial:

21          **A.      <u>Names and addresses of IPA/Maxwell's witnesses.</u>**

22          1.      Marc Maxwell
23                   c/o Glaser Weil Fink Howard Avchen & Shapiro LLP
                     10250 Constellation Blvd., 19th Floor
24                   Los Angles, CA 90067

25          2.      Danny Chazonoff
26                   c/o Greenberg Traurig, LLP
                     1840 Century Park East, Suite 1900
27                   Los Angeles, CA 90067

28          3.      Joe Daly

*ACTIVE 66528800v1*

```
 1              c/o Greenberg Traurig, LLP
                1840 Century Park East, Suite 1900
 2              Los Angeles, CA 90067

 3      4.      Ben Dalfen
                c/o Greenberg Traurig, LLP
 4              1840 Century Park East, Suite 1900
                Los Angeles, CA 90067
 5
 6      5.      Nick Walker
                c/o Greenberg Traurig, LLP
 7              1840 Century Park East, Suite 1900
                Los Angeles, CA 90067
 8
 9      6.      Jordan Hamburger
                1901 Avenue of the Stars, Suite 1600
10              Los Angeles, CA 90067

11      7.      Shaun Lavelle
                c/o Greenberg Traurig, LLP
12              1840 Century Park East, Suite 1900
                Los Angeles, CA 90067
13
14      8.      Eric McLean
                c/o Greenberg Traurig, LLP
15              1840 Century Park East, Suite 1900
                Los Angeles, CA 90067
16
17      9.      Kelby Berg
                160 N. A Street
18              Tustin, CA 92780

19      10.     Todd Linden
                832-377-2230
20              Address unknown

21
22      11.     Trey Smith
                11578 Wake Circle
23              Cypress, CA 90630-5545

24      12.     Tony Runestad
                6161 W. 74th Street
25              Los Angeles, CA 90045

26      13.     Tina Makarem
                3900 Joaquin Avenue
27              Las Vegas, NV 89102-5911

28
```

PRETRIAL ORDER

2164397

*ACTIVE 66528800v1*

14. Deon McKinney
    22271 Parkwood Street
    Lake Forest, CA 92630-2341

15. Melissa Pauleat
    514-758-5852
    Address unknown

16. Alison Simonton
    c/o Greenberg Traurig, LLP
    1840 Century Park East, Suite 1900
    Los Angeles, CA 90067

17. Afshin Yazdian
    c/o Greenberg Traurig, LLP
    1840 Century Park East, Suite 1900
    Los Angeles, CA 90067

18. Chad Anselmo
    4226 Hidden Canyon Ct.
    Austin, TX 78746

19. David Moran, Esq.
    Manatt Phelps
    2049 Century Park East, Suite 1700
    Los Angeles, CA 90067

20. Matylda Smolen
    10601 Washington Blvd., Apt. 728
    Culver City, CA 90232-3488

21. Dave Landis
    Contact information unknown

22. Brian McArthur-Muscroft
    c/o Greenberg Traurig, LLP
    1840 Century Park East, Suite 1900
    Los Angeles, CA 90067

23. Fraser Cruickshank
    706-649-5548 or 706-329-9477
    fcruickshank@synovus.com

24. Carolyn Hayes
    c/o Greenberg Traurig, LLP
    1840 Century Park East, Suite 1900
    Los Angeles, CA 90067

74
PRETRIAL ORDER

25. Irina Arakelova
1176 Wellesley Avenue, #203
Los Angeles, CA 90049

26. Irwin Nachimson
c/o Glaser Weil, LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067

27. Patrick Moran
c/o Glaser Weil, LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067

**B.** **Names and addresses of GMA LLC's witnesses.**

1. Marc Maxwell
c/o Glaser Weil Fink Howard Avchen & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067

2. Sandah Vint
Address unknown

3. Danny Chazanoff
c/o Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

4. Joe Daly
615-734-9258
Address Unknown

5. Todd Linden
832-375-2230
Address unknown

6. Ben Dalfen
c/o Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

7. Nick Walker
c/o Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

8. Joseph Liburt
1000 Marsh Road
Menlo Park, CA 94025

9. Jordan Hamburger
1901 Avenue of the Stars, Suite 1600

2164397
*ACTIVE 66528800v1*

Los Angeles, CA 90067

10.    Alan Kleinman
       Address Unknown

11.    Hiep Tran
       Address Unknown

12.    Kerri Lewis
       Contact information unknown

13.    Eric McLean
       c/o Greenberg Traurig, LLP
       1840 Century Park East, Suite 1900
       Los Angeles, CA 90067

14.    Kelby Berg
       562-307-3465
       Address unknown

15.    Shaun Lavelle
       c/o Greenberg Traurig, LLP
       1840 Century Park East, Suite 1900
       Los Angeles, CA 90067

16.    Trey Smith
       11578 Wake Circle
       Cypress, CA 90630-5545
       (unconfirmed contact information)

17.    Tony Runestad
       6161 W 74th Street
       Los Angeles, CA 90045
       (unconfirmed contact information)

18.    Tina Makarem
       3900 Joaquin Avenue
       Las Vegas, NV 89102-5911
       (unconfirmed contact information)

19.    Deon McKinney
       22271 Parkwood Street
       Lake Forest, CA 92630-2341
       (unconfirmed contact information)

20.    Melissa Pauleat
       514-758-5852
       Address unknown

21.    Alison Simonton
       c/o Greenberg Traurig, LLP
       1840 Century Park East, Suite 1900
       Los Angeles, CA 90067

22.    Afshin Yazdian

PRETRIAL ORDER

2164397
*ACTIVE 66528800v1*

c/o Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

23.   Chad Anselmo
Contact information unknown

24.   David Moran, Esq.
Manatt Phelps
2049 Century Park Ease
Suite 1700
Los Angeles, CA 90067

25.   Lynne Hermle, Esq.
Orrick Herrington & Sutcliffe, LLP
1000 Marsh Road
Menlo Park, CA 94025

26.   Matylda Smolen
10601 Washington Blvd., Apt. 728
Culver City, CA 90232-3488
(unconfirmed contact information)

27.   Dave Landis
Contact information unknown

29.   Brian McArthur-Muscroft
c/o Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

30.   Fraser Cruickshank
(706.649.5548 or 706.329.9477)
fcruickshank@synovus.com

31.   Carolyn Hayes
c/o Greenberg Traurig, LLP
1840Century Park East, Suite 1900
Los Angeles, CA 90067

32.   Irina Arakelova
1176 Wellesley Avenue, #203
Los Angeles, CA 90049
(unconfirmed contact information)

33.   Chad Salsbery
Managing Director
99 Monroe NW, Ste. 200
Grand Rapids, MI 49503

34.   Any necessary rebuttal or impeachment witnesses.

2164397

*ACTIVE 66528800v1*

35.     Any witnesses identified by IPA/Maxwell.

**IX.     PROPOSED TRIAL DATES**

Trial is estimated to last 10 court days.  The attorneys have met and jointly offer these trial dates:

May 22 – June 2, 2023

July 3-17, 2023

August 28 – September 8, 2023

DATED:  July 28, 2022               GLASER WEIL FINK HOWARD
                                    AVCHEN & SHAPIRO LLP


                                By:  /s/ Sean Riley
                                    PATRICIA L. GLASER
                                    SEAN RILEY
                                    STEVEN BASILEO
                                    *Attorneys for Plaintiffs International Payment*
                                    *Advisors Ltd and Marc Maxwell*


DATED:  July 28, 2022               KRAVITZ, SCHNITZER & JOHNSON, CHTD.


                                By:  /s/ Martin J. Kravitz
                                    MARTIN J. KRAVITZ
                                    *Attorneys for Plaintiffs International Payment*
                                    *Advisors Ltd and Marc Maxwell*


DATED:  July 28, 2022               GREENBERG TRAURIG, LLP


                                By:  /s/ Mark D. Kemple
                                    MARK D. KEMPLE
                                    JASON K. HICKS
                                    *Attorneys for Defendant Global Merchant*
                                    *Advisors, LLC, f/k/a Paysafe Services (US) LLC*

2164397
*ACTIVE 66528800v1*